IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON

**OHIO VALLEY ENVIRONMENTAL
COALITION, INC.; WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.;
and SIERRA CLUB**

        **Plaintiffs,**

**v.**                            **CIVIL ACTION NO. 3:11-cv-00115**

**PATRIOT COAL CORPORATION, et al.,**

        **Defendants, and**

**ERP ENVIRONMENTAL FUND, INC.,**

        **Substituted Defendant.**

<u>**SECOND MODIFIED CONSENT DECREE**</u>

**I.  RECITALS**

    1.    On February 18, 2011, Plaintiffs Ohio Valley Environmental Coalition,
Inc., West Virginia Highlands Conservancy, Inc., and Sierra Club (collectively "Plaintiffs") filed
this action against Defendants Patriot Coal Corporation ("Patriot"), Apogee Coal Company, LLC
("Apogee"), Catenary Coal Company, LLC ("Catenary"), and Hobet Mining, LLC ("Hobet")
(collectively "Defendants").  On April 14, 2011, Plaintiffs subsequently filed a First Amended
Complaint for Declaratory and Injunctive Relief and for Civil Penalties.

    2.    The Amended Complaint alleged that:

        a.  Defendant Apogee had discharged concentrations of selenium in
excess of the effluent limits for that parameter contained in West
Virginia/National Pollution Discharge Elimination System
("WV/NPDES") Permit No. WV0099520 issued to Apogee by the

West Virginia Department of Environmental Protection ("WVDEP") pursuant to Section 402 of the federal Clean Water Act ("CWA") and the West Virginia Water Pollution Control Act.

b.   Defendant Catenary had discharged concentrations of selenium in excess of the effluent limits for that parameter contained in WV/NPDES Permit Nos. WV0093751, WV0096920, WV0096962, and WV1014684 issued to Catenary by the WVDEP pursuant to Section 402 of the CWA and the West Virginia Water Pollution Control Act.

c.   Defendant Hobet had discharged concentrations of selenium in excess of the effluent limits for that parameter contained in WV/NPDES Permit Nos. WV1017225, WV0099392, WV1016776, WV1020889, and WV1021028 issued to Hobet by the WVDEP pursuant to Section 402 of the CWA and the West Virginia Water Pollution Control Act.

3.    The Amended Complaint further alleged that Defendants' discharges of selenium in concentrations exceeding those permitted by their respective WV/NPDES permits constituted violations of the performance standards under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA").

4.    On January 18, 2012, Plaintiffs and Defendants filed a Notice of Lodging of Proposed Consent Decree ("Consent Decree").  The Plaintiffs and Defendants intended the Consent Decree to resolve in their entirety the claims set forth in the Amended Complaint.  On March 5, 2012, the United States filed a notice indicating that it had no objections to the entry of

the Consent Decree, and on March 15, 2012 the Court issued an order entering the Consent Decree.

5.      On July 9, 2012, Hobet, Apogee, and Catenary -- along with their parent company, Patriot Coal Corporation and substantially all of its subsidiaries -- filed for reorganization under chapter 11 of the U.S. Bankruptcy Code.

6.      After entry of the Consent Decree, Defendants worked diligently and in good faith to comply with the deadlines set forth therein, paid the civil penalties required under Section V therein, funded the Supplemental Environmental Project described in Section VI therein, and made significant progress with respect to identifying new treatment technologies for achieving compliance with the selenium effluent limitations for a number of outfalls included in the Amended Complaint.

7.      Due to issues associated with the 2012 Chapter 11 reorganization process, Plaintiffs and Defendants entered into good faith negotiations with respect to the remaining compliance deadlines set forth in the Consent Decree, and sought to amend the compliance deadlines for those outfalls.

8.      On January 9, 2013, the Court entered the Modified Consent Decree in this action.

9.      On May 12, 2015, Defendants filed a petition with the United States Bankruptcy Court for the Eastern District of Virginia under chapter 11 of title 11 of the United States Code.

10.      During the course of the 2015 bankruptcy proceedings, Defendants negotiated the sale of substantially all of their assets to two separate entities:  (1) Blackhawk Mining, LLC ("Blackhawk") and (2) the Virginia Conservation Legacy Fund and its affiliate

ERP Compliant Fuels, LLC (collectively, "VCLF").  Asset Purchase Agreements ("APAs") for both transactions were signed and filed with the Bankruptcy Court.  Under the Blackhawk APA, Blackhawk acquired certain mining assets and WV/NPDES permits from Defendants, including certain WV/NPDES permits that are subject to the Modified Consent Decree.  The Blackhawk APA provides that Blackhawk would assume the Modified Consent Decree obligations with respect to those acquired WV/NPDES permits.  Similarly, under the VCLF APA, ERP Compliant Fuels, LLC acquired the remaining assets and assumed the Modified Consent Decree obligations with respect to the balance of the WV/NPDES permits and outlets subject to the Modified Consent Decree.

11.    In accordance with the Bankruptcy Court's Scheduling Order, on September 18, 2016, Patriot filed the *Fourth Amended Disclosure Statement for the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*. The Fourth Amended Plan proposed to consummate the Blackhawk Transaction and the VCLF Transaction, which together provided for the sale of substantially all of Defendants' assets.  On that same date, Defendants commenced solicitation of the Fourth Amended Plan.

12.    Defendants' creditors and others, including Plaintiffs in this action, asserted their claims and interests before the Bankruptcy Court.  On October 8, 2015, Defendants submitted their *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("Confirmation Order") to the Bankruptcy Court.  On October 9, 2015, the Bankruptcy Court entered the Confirmation Order.  That Order was attached as Exhibit 1 to the memorandum submitted to this Court on October 14, 2015.  CM/ECF # 91.  In the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, "VCLF" is

defined to include ERP Compliant Fuels, LLC, for purposes of the obligations that VCLF assumed under the Confirmation Order.

13.     The Confirmation Order expressly acknowledges the assumption by Blackhawk and VCLF of the Modified Consent Decree obligations, stating that "nothing in the Plan, the Plan Supplement, any document relating to the Plan (including, but not limited to, the Blackhawk Transaction Documents, the VCLF Transaction Documents and the Liquidating Trust Agreement) or this Confirmation Order: . . . (2) with respect to VCLF or Blackhawk: releases, discharges, exculpates, precludes, or enjoins the enforcement of . . . (ii) any obligations under the Specified Orders and Agreements expressly assumed . . . by VCLF pursuant to the VCLF Transaction Documents[.]"  The "Specified Orders and Agreements" are defined in the Confirmation Order to include the Modified Consent Decree in this action.

14.     The Blackhawk transaction closed on October 26, 2015, and the VCLF transaction closed on October 27, 2015.  The terms of the Confirmation Order provide for Blackhawk and VCLF to assume responsibility for compliance with the Modified Consent Decree applicable to their respective acquired assets and permits.  Since the submission of the *Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Substituted Defendant, Virginia Conservation Legacy Fund, Inc., and Blackhawk have negotiated and agreed that Substituted Defendant will assume all of Blackhawk's obligations under the Modified Consent Decree.

15.     Pursuant to an Assignment and Assumption Agreement executed on or about October 27, 2015, ERP Compliant Fuels, LLC, assigned (among other things) its obligations under the Modified Consent Decree to ERP Environmental Fund, Inc.  On May 2,

2016, the Court substituted ERP Environmental Fund, Inc., as the Defendant in this action. CM/ECF # 97.

16.     Substituted Defendant ERP Environmental Fund, Inc., is presently not in compliance with certain deadlines and obligations under the Modified Consent Decree.  That state of noncompliance is partially the result of Defendants' 2015 Bankruptcy proceeding, and partially because of Substituted Defendant's financial condition.  Substituted Defendant's start-up capital has been less than expected.  The Parties expect that the current state of noncompliance will persist for the foreseeable future because of Substituted Defendant's financial condition.

17.     To allow Substituted Defendant time to come into compliance with its obligations with respect to this action and to regain its financial footing, the Parties have agreed to a forty-two (42) month extension of certain deadlines in the Modified Consent Decree.  Those extensions necessitate the entry of this Second Modified Consent Decree.

18.     In consideration for the extended deadlines, Substituted Defendant and its parent company VCLF Land Trust, Inc.[1] have agreed to fund forest and stream restoration in West Virginia pursuant to the Selenium Settlement Agreement with Plaintiffs executed on August 19, 2016.  The Selenium Settlement Agreement is attached to this Second Modified Consent Decree as Appendix F, and its terms and conditions are hereby incorporated by reference into this Second Modified Consent Decree as if fully set forth herein.

19.     This Second Modified Consent Decree also reflects previously agreed to addenda to the Modified Consent Decree.  Specifically, this Second Modified Consent Decree incorporates into its terms

---

[1] Virginia Conservation Legacy Fund, Inc., transferred the interests and obligations that it obtained under the APA to VCLF Land Trust, Inc., on or about December 7, 2015.

      a.       The *First Addendum to Modified Consent Order* executed in April 2014 (CM/ECF # 89-1);

      b.       The *Second Addendum to the Modified Consent Decree* executed in August 2014 (CM/ECF # 89-2);

      c.       The *Third Addendum to the Modified Consent Order* executed in January 2016 (CM/ECF # 95); and

      d.       The *Fourth Addendum to the Modified Consent Order* executed in July 2016 (CM/ECF # 98).

20.    The Parties recognize, and the Court by entering this Second Modified Consent Decree finds, that the Second Modified Consent Decree has been negotiated by the Parties in good faith and will avoid further litigation among them, and that this Decree is fair, reasonable and in the public interest.  By entering into this Second Modified Consent Decree, neither Defendants nor Substituted Defendant admit any of the allegations set forth in the Complaint or the Amended Complaint.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED AND DECREED as follows:

## II.  JURISDICTION AND VENUE

21.    This Court has jurisdiction over the Parties and Defendants and over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (CWA citizen suit provision) and 30 U.S.C. § 1270 (SMCRA citizen suit provision).

22.    Venue is proper in the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(b) and (c), because it is the judicial district in which Defendants and Substituted

Defendant are located, reside and/or do business, and/or in which the violations alleged in the Amended Complaint occurred, as well as 33 U.S.C. § 1365(c)(1), because the sources of the alleged CWA violations are located in this judicial district, and 30 U.S.C. § 1270(c), because the coal mining operations complained of are located in this judicial district.

23.     For purposes of this Second Modified Consent Decree, or any action to enforce this Second Modified Consent Decree or the Selenium Settlement Agreement, Substituted Defendant and its Affiliated Companies consent to this Court's jurisdiction over this Second Modified Consent Decree and consents to venue in this judicial district.

### III.  APPLICABILITY

24.     The provisions of this Second Modified Consent Decree apply to and are binding upon Plaintiffs and those with authority to act on their behalf, including, but not limited to, their officers, directors, and staff; upon Substituted Defendant and any of its respective successors and/or assigns; and upon other persons or entities otherwise bound by the law.

25.     Except for those restrictions on Large Scale Surface Mining set forth in Paragraphs 54 through 58 herein, the applicability and duration of which shall be governed solely by the terms of Section VIII, and the restrictions on Surface Mining set forth in Paragraph 63, no transfer of ownership or operation of any Facility shall relieve Substituted Defendant of its obligation to ensure that the terms of this Second Modified Consent Decree are implemented, provided, however that, prior to any transfer, any party desiring to transfer ownership or operation of any Facility shall provide a copy of this Second Modified Consent Decree to the proposed transferee and require the transferee to provide written confirmation to the Court acknowledging the terms of the Second Modified Consent Decree and that the transferee will be bound by those terms.  In such event, the transferring party shall no longer be subject to this

Decree. There shall be no requirement to provide written confirmation to the Court if the ultimate parent of Substituted Defendant will change as a result of a transaction, but the Substituted Defendant owning or operating the Facility will not change. In any event, all transferees, subsequent owners, and operators shall be bound by the terms of this Second Modified Consent Decree, consistent with applicable law.

26. Substituted Defendant shall provide a copy of this Second Modified Consent Decree to all officers, employees and agents whose duties include compliance with any provision of this Second Modified Consent Decree, as well as to any contractor retained to perform work required under this Second Modified Consent Decree.

## IV. DEFINITIONS

27. Terms used in this Second Modified Consent Decree that are defined in the CWA, SMCRA or in regulations issued pursuant thereto shall have the meanings assigned to them therein, unless otherwise provided in this Decree. Whenever the terms set forth below are used in this Second Modified Consent Decree, the following definitions shall apply:

a. "Affiliated Company" shall mean any business organization or entity, regardless of form, directly or indirectly controlling, controlled by, or under common control with ERP Environmental Fund, Inc. For purposes of this definition, "control" means the power to direct the management and policies of the relevant entity, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

b. "Alternative Abatement Plan" shall mean a plan for the implementation of a Listed Technology at a Covered Outfall;

c.  "Amended Complaint" shall mean the First Amended Complaint for Declaratory and Injunctive Relief and for Civil Penalties filed by Plaintiffs in this action on April 14, 2011;

d.  "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Eastern District of Virginia or other bankruptcy court of competent jurisdiction;

e.  "Consent Decree" shall mean the Consent Decree entered by this Court on March 15, 2012.

f.  "Covered Outfalls" shall mean the discharge points for the Covered Permits as identified in Appendix A to this Second Modified Consent Decree.

g.  "Covered Permits" shall mean permits that were the subject of this litigation as those permits are now in effect and as they may be amended, modified, or renewed, following the procedures for such amendment, modification, or renewal prescribed by the applicable federal and state statutes and regulations and interpreted by this Court in relevant decisions for the duration of this Second Modified Consent Decree, including: WV/NPDES Permit Nos. WV0099520, WV0093751, WV0096920, WV0096962, WV1014684, WV1017225, WV0099392, WV1016776, WV1020889, and WV1021028.  Unless a proposed modification falls within the definition of a "minor modification" as provided in 47 C.S.R. § 30-8.2.c.1, any change to the selenium effluent limitations in the Covered Permits shall be a major modification subject to public notice and comment and all other applicable requirements of federal and state law.  In all events, if Substituted Defendant intends to apply for a "minor modification" that would affect the selenium effluent limitations in one or more of the Covered Permits, Substituted Defendant shall notify Plaintiffs of that intent at least 30 days prior to submitting a modification application to WVDEP.

h.  "Daily maximum violation" shall mean an exceedance of the effective maximum daily effluent limit of the applicable WV/NPDES Permit.

i.  "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Second Modified Consent Decree, where the last day would fall on a Saturday, Sunday or federal holiday, the period shall run until the close of business of the next business day except for purposes of calculating periods of stipulated payments under Section IX of this Decree;

j.  "DMR" means a Discharge Monitoring Report for one of the Covered Permits;

k.  "Effective Date" shall have the definition provided in Section XV;

l.  "Facility" or "Facilities" shall mean Covered Outfalls and mining operations subject to the Covered Permits;

m.  "Large Scale Surface Mining" shall mean Surface Mining requiring an individual permit under Section 404 of the Clean Water Act.  For purposes of this Second Modified Consent Decree, underground face-ups, haul roads, preparation plants and facilities typically associated therewith (e.g., overland belts, storage areas, etc.), refuse impoundments and Small Scale Surface Mining are not considered Large Scale Surface Mining, notwithstanding, in each of the foregoing cases, any need for an individual Section 404 permit;

n.  "Loudoun Property" shall mean the 313-acre tract of land in Loudoun County, Virginia that VCLF Land Trust, Inc., is using as collateral to secure future payments under the Selenium Settlement Agreement;

o.  "Maximum daily effluent limit" shall mean maximum daily selenium discharge limitation as defined in 40 C.F.R. § 122.2;

p.   "Modified Consent Decree" shall mean the Modified Consent Decree entered by this Court on January 9, 2013;

q.   "Monthly average effluent limit" shall mean average monthly selenium discharge limitation as defined in 40 C.F.R. § 122.2;

r.   "Monthly average violation" shall mean an exceedance of the effective monthly average effluent limit of the applicable WV/NPDES Permit;

s.   "Paragraph" shall mean a portion of this Second Modified Consent Decree identified by an Arabic numeral;

t.   "Parties" shall mean Plaintiffs and ERP Environmental Fund, Inc., as Substituted Defendant;

u.   "Second Modified Consent Decree" or "Decree" shall mean this Second Modified Consent Decree and the appendices attached hereto;

v.   "Section" shall mean a portion of this Second Modified Consent Decree identified by a Roman numeral;

w.   "Selenium Settlement Agreement" shall mean the agreement executed by the Parties on August 19, 2016 and attached to this Second Modified Consent Decree as Appendix F.

x.   "Small Scale Surface Mining" shall mean Surface Mining, provided that such activities

(1) are conducted

i.   at complexes that have the three following characteristics:

(a) underground mines in existence as of the date the Modified Consent Decree was entered or where it can be

12

demonstrated that there were plans as of the date of entry of the Modified Consent Decree to conduct underground mining; (b) surface mines in existence as of the date the Modified Consent Decree was entered or where it can be demonstrated there were plans as of the date the Modified Consent Decree was entered to conduct Surface Mining at those complexes; and (c) where Substituted Defendant or any of its subsidiaries or Affiliated Companies is relying upon property rights to mine coal that it or another coal mine operator obtained on or before the date the Modified Consent Decree was entered; or

    ii.  for the purpose of generating material to reclaim an area permitted as a coal mining refuse area; and

(2) use equipment typically associated with small scale surface mining such as end loaders, bulldozers, excavators, highwall miners, and augers or similar equipment. For purposes of this Second Modified Consent Decree, Small Scale Surface Mining is not associated with the construction of valley fills requiring an individual permit under Section 404 of the Clean Water Act.

    y.  "State" shall mean the State of West Virginia;

    z.  "Substituted Defendant" shall mean ERP Environmental Fund, Inc.

    aa. "Surface Mining" shall mean the removal of the earth and rock covering from the surface of the land to extract the coal;

    bb. "USEPA" shall mean the United States Environmental Protection Agency;

cc. "WVDEP" shall mean the West Virginia Department of Environmental Protection; and

dd. "WV/NPDES permit" shall mean a West Virginia / National Pollutant Discharge Elimination System permit issued by WVDEP pursuant to Section 402 of the CWA.

## V.  CIVIL PENALTY

28.     As required under paragraphs 12 and 13 of the Consent Decree, Defendants paid a civil penalty in the amount of $750,000 to the United States.  Together with the Supplemental Environmental Project ("SEP") set forth in Section VI, the payment of this civil penalty was made in settlement of all of Plaintiffs' claims in this action under the CWA and SMCRA for violations occurring prior to the effective date of the Consent Decree.

29.     The sum set forth in Paragraph 28, *supra*, resolved Plaintiffs' demands for civil penalties under 33 U.S.C. § 1365 arising from any selenium violations alleged in Plaintiffs' Amended Complaint and any selenium violations that occurred at any Covered Outfalls or under any Covered Permits up to the effective date of the Consent Decree.

30.     Defendants shall not deduct any penalties paid under the Consent Decree pursuant to this Section in calculating their respective federal, state, or local income tax.

## VI.  SUPPLEMENTAL ENVIRONMENTAL PROJECT

31.     In addition to the civil penalty set forth in Section V, above, Defendants paid a total of $6,750,000.00 to the West Virginia Land Trust in order to fund those Supplemental Environmental Projects required by Paragraph 16 of the Consent Decree and as set forth under Appendix B of the Consent Decree.

32.     Defendants shall not deduct their contribution to the SEP or any payments made pursuant to Section IX ("Stipulated Payments") in calculating their respective federal, state, or local income tax.

## VII.   COMPLIANCE REQUIREMENTS

33.     This Second Modified Consent Decree in no way affects or relieves Substituted Defendant of its responsibility to comply with applicable federal, state and local laws, regulations and permits, but Plaintiffs shall not seek any remedies under the CWA or SMCRA for violations of selenium effluent limits at the Covered Outfalls so long as this Decree is in effect other than those remedies set forth herein.

34.     Where any compliance obligation under this Section requires Substituted Defendant to obtain a federal, state or local permit or approval, Substituted Defendant shall submit timely and substantially complete applications and take all other actions necessary to obtain all such permits or approvals.  Substituted Defendant may seek relief under the provisions of Section X of this Second Modified Consent Decree ("Force Majeure") for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if Substituted Defendant has submitted timely and substantially complete applications and has taken all other actions necessary to obtain all such permits or approvals.  Notwithstanding the foregoing, if a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation results from a successful challenge by Plaintiffs to a permitting or approval decision on an issue that Plaintiffs made a good-faith effort to resolve with Substituted Defendant prior to commencing such a challenge, then Substituted Defendant may not avail itself of relief under Section X of this Second Modified Consent Decree.

**Treatment Technology Selection and Implementation**

35.     Under the respective Covered Permits, Substituted Defendant shall select and install selenium treatment technologies at each Covered Outfall such that the Covered Outfalls will achieve compliance with selenium discharge limits contained in relevant Covered Permits in accordance with the compliance date set forth in Appendix C (hereinafter a "Selected Technology").  If Substituted Defendant believes that compliance is or will be achieved without additional treatment at one or more Covered Outfalls, it shall so indicate on or before the relevant technology selection date set forth in Appendix C and shall provide a written statement to the Plaintiffs and the Special Master setting forth the basis for that determination at that time.

36.     When Substituted Defendant chooses the Selected Technology for any Covered Outfall, it shall also supply a reasonable schedule of activities necessary for the expeditious installation of that technology by the applicable compliance date set forth in Appendix C.  That schedule shall include (a) a reasonably detailed GANTT chart setting out key milestones for engineering, procurement, and construction and (b) a schedule for Substituted Defendant's submission of periodic progress reports to the Plaintiffs, the Court and any Special Master appointed under Section XIII below.  If an Alternative Abatement Plan is required under Paragraph 40 below, Substituted Defendant shall provide such a plan by the dates specified in that Paragraph.

37.     Sixty days before the technology selection date for any Covered Outfall as set forth in Appendix C, a list of technologies that may be used at the flow rates specified in the related category to treat and remove selenium at the Covered Outfalls or under the Covered Permits shall be certified by the Special Master.  Technologies appearing on such list are hereinafter referred to as "Listed Technologies."  Substituted Defendant may select a Listed

Technology for installation and use at a Covered Outfall and a flow rate for which it has been listed.

38.     The list of technologies for each category of Covered Outfalls on Appendix C will be created pursuant to Paragraph 39, below.  A technology is only a Listed Technology for those categories where it has been added to the list of technologies pursuant to Paragraph 39.  The Parties will continue to cooperate in good faith to amend, update, add or delete technologies to the Listed Technologies for the Covered Outfalls.  In accordance with the procedures set forth in Paragraph 39, below, a technology may be added or deleted as a Listed Technology for any particular Covered Outfall at any time prior to the compliance date for that Category as set forth in Appendix C.

39.     Technologies may be added to or deleted from the Listed Technologies, and such list may be amended, as follows:

      a.  By agreement of the Parties;

      b.  Based upon the determination of the Special Master after the presentation of a pilot report or other data by one of the parties; provided that, the moving party has the burden of establishing that the technology should be added to or deleted from the list because of its applicability to the flow rates of the outfalls on a particular list, and provided that the non-moving party has an opportunity to comment on and oppose the inclusion or deletion of any technology on the list; or

      c.  Based upon the determination of the Special Master after one of the Parties submits a request to add or delete a technology based

upon field data from installed treatment systems, and provided that the non-moving party has the opportunity to comment on and oppose the inclusion or deletion of any technology on the list. These data may come from third party sources.

40. No later than the technology selection date for a Covered Outfall established in Appendix C, Substituted Defendant shall choose a Selected Technology for installation at that Covered Outfall. A Selected Technology may, but need not, come from the Listed Technologies for that category. Substituted Defendant shall choose a Selected Technology for each Covered Outfall, subject to the following:

a. If Substituted Defendant chooses a Selected Technology that is also a Listed Technology for a Covered Outfall, Substituted Defendant shall not be required to submit an Alternative Abatement Plan for that Covered Outfall. If Substituted Defendant chooses a Listed Technology, the information required by Subparagraphs 36(a) and (b) shall be submitted to the Special Master and to Plaintiffs. Plaintiffs shall have the opportunity to comment to the Special Master on the selection, as well as the information required by Subparagraphs 36(a) and (b), within 21 days of receipt of the selection. The Plaintiffs shall have the burden to establish by a preponderance of the evidence that such selection is inconsistent with customary engineering practices and principles. In the event the Special Master agrees with Plaintiffs objections, then such technology shall be treated as a not Listed

18

Technology for the Covered Outfall at issue for purposes of this Decree, including the Stipulated Payments provisions in Section IX, and Substituted Defendant will be required to submit an Alternative Abatement Plan for the Covered Outfall at issue as required in Paragraph 40(b) below.

b. Except as set forth in subparagraph 40(c), if Substituted Defendant chooses a Selected Technology for a Covered Outfall that is not a Listed Technology, it shall also initially identify an alternative Listed Technology (hereinafter "Alternative Technology") by the relevant technology selection date and shall submit to the Plaintiffs and the Special Master an Alternative Abatement Plan containing, at a minimum, the following information regarding the Alternative Technology within 60 days after the relevant technology selection date:

   i.   A process design narrative describing the effluent limits which will be met;

   ii.  A listing of treatment objectives applicable to the design;

   iii. The characteristics of the water to be treated;

   iv.  An engineering evaluation of applicable technologies capable of successfully treating the water;

   v.   A narrative description of the design in sufficient detail to be reviewed by persons competent in water/wastewater treatment technologies;

vi.   Process design summary tables containing selected design parameters;

vii.   Preliminary size of major unit processes and ancillary equipment required;

viii.   Preliminary estimates of chemical requirements;

ix.   A process flow diagram containing primary flow lines;

x.   Major unit processes;

xi.   Preliminary flow and material balances;

xii.   A Class 5 Capital cost estimate and operating cost estimate;

xiii.   A preliminary equipment list;

xiv.   An estimation of average and maximum flows from the outfall and a reasonably detailed equalization plan if any;

xv.   A reasonably detailed GANTT chart establishing a schedule for engineering, procurement, construction, and commissioning of the Alternative Technology;

xvi.   A preliminary engineering report (applicable to Covered Outfalls in Categories III, IV, and V only); and

xvii.   Any other information requested or required by the Special Master (applicable to Covered Outfalls in Categories I and II only).

c.   Notwithstanding the foregoing, if a ZVI-type treatment system is not a Listed Technology for Category I Covered Outfalls as of the relevant technology selection date set forth in Appendix C and

Substituted Defendant chooses a ZVI-type treatment system as a Selected Technology for any Covered Outfall in Category I, no Alternative Abatement Plan shall be due until March 1, 2013 and the Alternative Abatement Plan requirement will be waived if Special Master determines that the proposed ZVI-type system will succeed.  Provided, however, that Plaintiffs have an opportunity to comment and object to the omission of an Alternative Abatement Plan prior to the Special Master's decision and the Special Master will issue a written determination addressing the Parties' respective positions.

d.  Notwithstanding the other provisions of this Decree, the Parties expect that Substituted Defendant will choose a Listed Technology for use at all Category IV and V Covered Outfalls (as Categories IV and V are set forth on Appendix C).  If, however, Substituted Defendant chooses a Selected Technology that is not a Listed Technology for a Category IV or V Covered Outfall, that decision shall be submitted to the Special Master for review and Plaintiffs shall be entitled to comment.  Substituted Defendant shall bear the burden of proof before the Special Master to establish that the Selected Technology will succeed in meeting the requirements of the Covered Permit at the Covered Outfall for which the Selected Technology has been chosen by the compliance deadline set forth in Appendix C.  Substituted Defendant carries its burden when it

establishes by a preponderance of the evidence that its choice of Selected Technology is consistent with customary engineering practices and principles.   If the Special Master approves the Selected Technology, Substituted Defendant must also prepare and submit an Alternative Abatement Plan containing the elements set forth in Paragraph 40(b) above.

41.    In determining when an Alternative Abatement Plan shall be implemented for a Covered Outfall under this Second Modified Consent Decree, Substituted Defendant shall employ the following criteria:

        a.   For Categories I and II:

            i.   The first six months following the Category Compliance Date for the installation of a Selected Technology at a Covered Outfall shall be considered a "start-up" period for that Covered Outfall and sampling data acquired during those six months shall neither be used to determine whether Substituted Defendant will be required to implement an Alternative Abatement Plan nor whether the Second Modified Consent Decree shall terminate as to that Covered Outfall, provided, however, that if a Selected Technology is constructed and commissioned prior to the Category Compliance Date set out in Appendix C, Substituted Defendant may use sampling data acquired between the actual commissioning date and the Category Compliance

Date set out in Appendix C to establish that the Second Modified Consent Decree should terminate as to that Outfall pursuant to Paragraph 43.

ii. For months seven (7) through twelve (12) following the Category Compliance Date for the installation of a Selected Technology at a Covered Outfall, if more than four (4) of the samples of the effluent from the Covered Outfall exceed the maximum daily selenium effluent limitations in the relevant Covered Permit or if two (2) of the monthly average selenium concentrations exceed the monthly average selenium effluent limitation in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.  Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.  In any such determination, the Special Master may consider the extent to which the

violations exceeded the permit limits, flows, upsets, and any other operating conditions.

iii.  If Substituted Defendant does not achieve six consecutive months of compliance with the selenium effluent limitations on a Covered Outfall in the relevant Covered Permit during the first twelve months following the Category Compliance Date in Appendix C, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.  Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.  In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

iv.  If this Second Modified Consent Decree is not terminated as to a Covered Outfall pursuant to Paragraphs 43 and 108 during the first 12-month period following the Category

Compliance Date established in Appendix C for that outfall, but the Alternative Abatement Plan is not triggered for that Outfall under Subparagraphs 41(a)(ii) or (iii), then the following triggers for the Alternative Abatement Plan shall apply during each subsequent 12-month period until the Second Modified Consent Decree is terminated as to that Covered Outfall:

1. If more than four (4) of the samples of the effluent from the Covered Outfall exceed the maximum daily selenium effluent limitations in the relevant Covered Permit or if two (2) consecutive monthly average selenium concentrations exceed the monthly average selenium effluent limitation in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.   Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the

relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.  In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

2.  If Substituted Defendant does not achieve six consecutive months of compliance with the selenium effluent limitations on a Covered Outfall in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.  Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.  In any such determination, the Special Master may consider the

extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

b.  For Categories III, IV, and V:

 i.  The first three months following the Category Compliance Date for the installation of a biologically-based Selected Technology at a Covered Outfall shall be considered a "start-up" period for that Covered Outfall and sampling data acquired during those three months shall neither be used to determine whether Substituted Defendant will be required to implement an Alternative Abatement Plan, nor whether the Second Modified Consent Decree shall terminate as to that Covered Outfall; provided, however, that if a biologically-based Selected Technology is constructed and commissioned prior to the Category Compliance Date set out in Appendix C, Substituted Defendant may use sampling data acquired between the actual commissioning date and the Category Compliance Date set out in Appendix C to establish that the Second Modified Consent Decree should terminate as to that Outfall pursuant to Paragraph 43.

 ii.  For months four (4) through twelve (12) following the Category Compliance Date for the installation of a

biologically based Selected Technology at a Covered Outfall, if more than four (4) of the samples of the effluent from the Covered Outfall exceed the maximum daily selenium effluent limitations in the relevant Covered Permit or if two (2) of the monthly average selenium concentrations exceed the monthly average selenium effluent limitation in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology. Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan. In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

iii. For the first twelve (12) months following the Category Compliance Date for the installation of a non-biologically based Selected Technology at a Covered Outfall, if more

than four (4) of the samples of the effluent from the Covered Outfall exceed the maximum daily selenium effluent limitations in the relevant Covered Permit or if two (2) of the monthly average selenium concentration exceed the monthly average selenium effluent limitation in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology. Plaintiffs shall have the right to comment on and object to Substituted Defendant's plan. Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan. In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

iv. If Substituted Defendant does not achieve six consecutive months of compliance with the selenium effluent limitations on a Covered Outfall in the relevant Covered

Permit during the first twelve months following the Category Compliance Date in Appendix C, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology. Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan. In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

v. If this Second Modified Consent Decree is not terminated as to a Covered Outfall pursuant to Paragraphs 43 and 108 during the first 12-month period following the Category Compliance Date established in Appendix C for that outfall, but the Alternative Abatement Plan is not triggered for that Outfall under Subparagraphs 41(b)(ii), (iii), or (iv), then the following triggers for the Alternative Abatement Plan shall apply during each subsequent 12-month period

until the Second Modified Consent Decree is terminated as to that Covered Outfall:

1. If more than four (4) of the samples of the effluent from the Covered Outfall exceed the maximum daily selenium effluent limitations in the relevant Covered Permit or if two (2) consecutive monthly average selenium concentrations exceed the monthly average selenium effluent limitation in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.   Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.   In any such determination, the Special Master may consider the extent to which the

violations exceeded the permit limits, flows, upsets, and any other operating conditions.

2. If Substituted Defendant does not achieve six consecutive months of compliance with the selenium effluent limitations on a Covered Outfall in the relevant Covered Permit, then Substituted Defendant shall implement an Alternative Abatement Plan for that Covered Outfall as soon as possible, except that Substituted Defendant shall have the right to seek approval from the Special Master to continue using the original Selected Technology.   Substituted Defendant shall seek approval from the Special Master and shall bear the burden of proof that the Selected Technology will be able to attain the required compliance with the relevant selenium limits in the relevant Covered Permit without implementing the Alternative Abatement Plan.   In any such determination, the Special Master may consider the extent to which the violations exceeded the permit limits, flows, upsets, and any other operating conditions.

c. All Alternative Abatement Plans must achieve compliance as soon as possible.

42.     At any time prior to the Category Compliance Date for a given Covered Outfall, Substituted Defendant may substitute another treatment technology for the original Selected Technology (hereinafter a "Replacement Technology"), so long as the Replacement Technology will achieve compliance by the date listed in Appendix C.  If Substituted Defendant proposes a Replacement Technology, the Special Master shall determine, after reviewing Substituted Defendant's submission and by a preponderance of the evidence, whether the technology will succeed in achieving compliance with the relevant selenium limits in the relevant Covered Permit by the compliance date in Appendix C and the substitution shall only become effective upon such a finding.

43.     The Second Modified Consent Decree shall remain in effect for a Covered Outfall until that Covered Outfall has achieved compliance with its relevant selenium discharge limits in the relevant Covered Permit for six (6) consecutive months after the actual commissioning date of the treatment technology at that Covered Outfall, three months of which must include analyses of samples taken in December, January, February, or March.  After any six-month period that Substituted Defendant believes satisfies the compliance requirements of this paragraph, Substituted Defendant may notify Plaintiffs in writing that they consider the Decree terminated as to such Covered Outfall.  After receipt of notice from Substituted Defendant, Plaintiffs shall have thirty (30) days to object to the Special Master that the required criteria set forth in this Paragraph and/or Paragraph 41 were not met or that conditions under which the system operated during the subject 6-month period are not representative of the anticipated conditions (including, but not limited to, temperature and flow) at this Covered Outfall.  After providing an opportunity for a response from Substituted Defendant and a reply from Plaintiffs, any dispute between the Parties shall be resolved by the Special Master.

**General Requirements Applicable to All Covered Permits and Covered Outfalls**

44.     Substituted Defendant shall prepare bi-monthly interim progress reports and submit them to the Court, Plaintiffs, and Special Master commencing after appointment of the Special Master.

45.     All reports shall be submitted to the persons designated in Section XIV of this Second Modified Consent Decree ("Notices").

46.     The reporting requirements of this Second Modified Consent Decree do not relieve Substituted Defendant of any reporting obligation required by the CWA, SMCRA or their implementing regulations, or by any other federal, state or local law, regulation, permit or other requirement.

47.     Any information provided pursuant to this Second Modified Consent Decree may be used by Plaintiffs in any proceeding to enforce the provisions of this Second Modified Consent Decree and as otherwise permitted by law, except that if information is submitted under a claim of confidentiality, then the scope of its use shall be determined by the Court.

48.     Substituted Defendant shall install treatment or manage flow sufficient to comply with its permit requirements and the provisions of this Decree.

**VIII.  ADDITIONAL REQUIREMENTS**

49.     If Defendants under the Modified Consent Decree did not already do so, then Substituted Defendant assumes the following obligations as set forth in Paragraph 37 of the Modified Consent Decree:  Substituted Defendant shall waive, or shall cause whichever of its Affiliated Companies assumes the mining operations of former Patriot Coal Corporation subsidiary Jupiter Holdings, LLC ("Jupiter") to waive, those rights it holds under CWA Section

404 permit 200200050-1 issued by the United States Army Corps of Engineers on March 15, 2007 relating to the Jupiter Callisto surface mine that would otherwise allow the construction of the four additional valley fills contemplated by the mine plan.  To accomplish the waiver, Substituted Defendant or the appropriate Affiliated Company shall surrender or otherwise modify Section 404 permit 200200050-1 so as to accomplish the elimination of the four additional valley fills as specified disposal sites under Section 404 of the CWA, while maintaining existing obligations with regard to the previously constructed valley fill at the Jupiter Callisto mine.

   50. If Defendants under the Modified Consent Decree did not already do so, then Substituted Defendant assumes the following obligations as set forth in Paragraph 38 of the Modified Consent Decree:  (1) Substituted Defendant and its Affiliated Companies shall forego the surface mining of any coal on the Callisto property pursuant to Jupiter's surface mine mining permit (S-5009-00) other than that which is incidental to their reclamation obligations so as to avoid long-term discharges of selenium in excess of the water quality standard; (2) Substituted Defendant and its Affiliated Companies shall seek a modification of the surface mining permit to delete those acres from the permit that should remain undisturbed as a result of the Modified Consent Decree while otherwise complying with existing reclamation obligations at this mine; (3) Substituted Defendant and its Affiliated Companies shall seek a modification of WV/NPDES Permit No. WV1020315 for the Callisto surface mine to delete from the permit those outfalls that are associated with the areas that will remain undisturbed; (4) Substituted Defendant shall pursue regulatory approval to reduce the disturbance required to reclaim the Jupiter complexes.  The Parties recognize that Substituted Defendant may propose steps to reduce disturbance that would require modification of reclamation obligations and corresponding regulatory and other third-

party approvals and authorizations.  So long as it is in the interests of all Parties, the Parties agree to cooperate with respect to Substituted Defendant's requests for such modifications of authorizations or approvals, and Plaintiffs recognize that, although Substituted Defendant shall seek such authorizations and approvals in good faith, Substituted Defendant can provide no assurances that such authorizations or approvals will be granted.

      51.    Substituted Defendant and its Affiliated Companies agree not to apply for new permits to surface mine the property covered by permits 200200050 and S-5009-00 in the future.  Nothing in this paragraph, however, shall be deemed to prevent Substituted Defendant or its Affiliated Companies from meeting or fulfilling its legal reclamation obligations with respect to the Callisto surface mine, including the surface disturbance or movement of any earth as necessary to meet such reclamation obligations.  The method by which Substituted Defendant or its Affiliated Companies will meet or fulfill its legal reclamation obligations shall be consistent with the representations made to Plaintiffs' mining engineering expert and shall be set forth in its application to modify surface mining permit S-5009-00, which is hereby incorporated by reference into this Decree as Appendix D and is docketed in the record in this matter as Document Number 49.

      52.    If Defendants under the Modified Consent Decree did not already do so, then Substituted Defendant assumes the following obligations as set forth in Paragraph 40 of the Modified Consent Decree:  Substituted Defendant shall, or shall cause whichever of its Affiliated Companies is appropriate to (1) waive those rights it holds under CWA Section 404 permit 2005-1005-BCR issued by the United States Army Corps of Engineers relating to the Colony Bay Central Area Surface Mine by taking the appropriate steps to terminate the authorization to conduct activities in waters of the United States granted by that permit and (2) to withdraw the

pending CWA 404 permit 2006-2290 submitted for the Colony Bay South Area Surface Mine. Substituted Defendant and its Affiliated Companies reserve the right to apply for or modify any permit to mine coal using Small Scale Surface Mining methods, so long as such efforts would not result in a violation of the limitations in Paragraph 63 on Substituted Defendant's future surface mining.

53.     If Defendants under the Modified Consent Decree did not already do so, then Substituted Defendant assumes the following obligations as set forth in Paragraph 41 of the Modified Consent Decree:  Substituted Defendant shall, or shall cause whichever of its Affiliated Companies is appropriate to, withdraw the pending CWA 404 permit application LRH-2009-908-BCR submitted for the Hill Fork South Mine in Boone County, West Virginia.  Substituted Defendant and its Affiliated Companies reserve the right to apply for or modify any permit to mine coal using Small Scale Surface Mining methods, so long as such efforts would not result in a violation of the limitations in Paragraph 63 on Substituted Defendant's future surface mining.

54.     As of the date of entry of the Modified Consent Decree, and as further set forth in Paragraphs 49 through 53 and in Paragraph 63, Substituted Defendant and its Affiliated Companies shall not submit any new applications for Clean Water Act Section 404 permits to construct or initiate new Large Scale Surface Mining.   Except as specifically set forth in Paragraphs 49 through 53 and in Paragraph 63, nothing in this Second Modified Consent Decree, however, shall preclude or prohibit Substituted Defendant or its Affiliated Companies from continuing to conduct Large Scale Surface Mining at any of its surface mining facilities or complexes in existence as of the date of entry of the Modified Consent Decree, or from renewing any required permits, regulatory approvals, or other authorizations, including Clean Water Act Section 404 permits, for such existing surface mining facilities or complexes.   With the

exception of Incidental Boundary Revisions, from the date of entry of the Modified Consent Decree the maximum total additional acreage to be permitted under one or more revisions to any permit associated with Large Scale Surface Mining shall not exceed twenty (20) percent of the existing permitted acreage as of the date of entry of the Modified Consent Decree or a maximum of fifty (50) acres, whichever is less; however, Substituted Defendant or its Affiliated Companies shall be allowed to amend a permit to include new permitted acres for an existing Large Scale Surface Mining operation if it has previously or concurrently deleted undisturbed permitted acres of a like or greater amount from that permit or a permit covering adjacent property without such amendment counting against the maximum amount of area that can be permitted through a permit revision.  Subject to the limitations in this paragraph and in Paragraph 63, Substituted Defendant and its Affiliated Companies are not precluded from obtaining any required permits, regulatory approvals or other authorizations, including Clean Water Act Section 404 permits, for existing Surface Mining facilities or complexes.

55.    This Second Modified Consent Decree shall not preclude or prohibit Substituted Defendant from conducting underground mining, Small Scale Surface Mining (so long as such mining is consistent with Paragraph 63 of this Second Modified Consent Decree), and/or constructing and operating haul roads, preparation plants, refuse impoundments, and related facilities at any time.

56.    If the following provisions of Paragraph 44 of the Modified Consent Decree remain unfulfilled at the time that the Court enters this Second Amended Consent Decree, then Substituted Defendant assumes those obligations as its own:  Within sixty (60) days of the date of entry of the Modified Consent Decree, Substituted Defendant shall retire its drag line at the Paint Creek Mining Complex.  Neither Substituted Defendant nor any of its Affiliated

Companies shall thereafter operate that drag line at the Paint Creek Mining Complex or elsewhere.  Substituted Defendant shall retire its drag line at the Corridor G Mining Complex no later than August 31, 2016; provided that, Substituted Defendant may seek relief under the provisions of Section X of this Second Modified Consent Decree ("Force Majeure") for any delay in the performance of any such mining or reclamation requiring the use of the drag line at the Corridor G Mining Complex.  Neither Substituted Defendant nor any of its Affiliated Companies shall thereafter operate that drag line at the Corridor G Mining Complex or elsewhere.  Substituted Defendant and its Affiliated Companies shall, however, have the right to sell the Corridor G Mining Complex drag line at its discretion; provided that any purchaser commits to not operate the drag line in Kentucky, Tennessee, Virginia and/or West Virginia. Prior to selling the drag line located at the Paint Creek Mining Complex, Substituted Defendant shall first seek permission from Appalachian Headwaters, Inc., which holds a security interest in the drag line.

57.    Except as required by contracts, existing rights or other legal commitments or obligations to which Patriot or its subsidiaries were subject as of the date of entry of the Modified Consent Decree, Substituted Defendant and its Affiliated Companies shall not enter into any new agreement which will result in coal produced by means of Large Scale Surface Mining by third parties being processed or loaded through a preparation plant or railroad facility that Substituted Defendant or its Affiliated Companies own or control.

58.    (a) Interim Cap:  For the period from January 1, 2014 through December 31, 2017, the annual coal production of Substituted Defendant, combined with its Affiliated Companies from Surface Mining will be limited as follows:

Year                Tons

39

| | |
|---|---|
| 2014 | 6.5 million |
| 2015 | 6 million |
| 2016 | 6 million |
| 2017 | 5 million |

(b)  Permanent Cap:  On or after January 1, 2018, the combined annual coal production of Substituted Defendant and its Affiliated Companies from Surface Mining shall not exceed 3 million tons per year and shall not exceed that amount in any subsequent calendar year.  The 3 million ton per year limitation may be adjusted as follows: (i) if Substituted Defendant or its Affiliated Companies complete a transaction on or after January 1, 2018 that results in one or more mines that engages in Surface Mining as of the date of that transaction no longer being owned or operated by Substituted Defendant or its Affiliated Companies, and, based on the then-effective five year budget plan, that mine is projected at the time of the completion of such a transaction to engage in Surface Mining in 2018 or any year thereafter, then coal production by Substituted Defendant and its Affiliated Companies from Surface Mining for each year that such a mine is projected to operate shall be adjusted so that the combined coal production from Surface Mining of Substituted Defendant and its Affiliated Companies shall not exceed 3 million tons per year minus the projected annual coal production from such a mine for each year of projected operation.  In the event such a mine is projected to continue mining beyond the then-effective five year budget plan, the deduction from the 3 million ton limit in those years shall be calculated by averaging the annual production projected in the five year budget plan; or (ii) if Substituted Defendant or its Affiliated Companies complete a transaction on or after January 1, 2018 that results in one or more mines that

(a) has previously engaged in Surface Mining but is inactive as of as of the date of that transaction;

(b) has coal reserves remaining to be mined by Surface Mining; and

(c) production from that mine is not included in the then-effective five year budget plan; no longer being owned or operated by Substituted Defendant or its Affiliated Companies, then the reduction in the 3 million ton per year limitation on production from Surface Mining shall be calculated as follows: the average of production from Surface Mining for the five year period preceding the last year that the mine was active (the "look-back period") shall be deducted from the 3 million ton per year limitation so that the combined coal production from Surface Mining of Substituted Defendant and its Affiliated Companies shall not exceed 3 million tons per year minus the average coal production from Surface Mining during the look-back period.  The duration of this deduction shall be derived by dividing the average production during the look-back period into the remaining reserves as specified in the mine plan in effect at the time of the transaction.

59.    Notwithstanding any other provision herein, except Paragraph 63, this Second Modified Consent Decree shall not affect the ability of Substituted Defendant or its Affiliated Companies to seek permits for the Huff Creek Surface Mine, including a Clean Water Act Section 404 permit, nor shall it effect the right of Substituted Defendant or its Affiliated Companies to initiate or conduct Large Scale Surface Mining at the Huff Creek Surface Mine, subject to the provisions of Paragraph 63.

60.    Upon the issuance of a Clean Water Act Section 404 permit for the Huff Creek Surface Mine under review by the U.S. Army Corps of Engineers on the Effective Date, if Plaintiffs do not initiate a legal proceeding to challenge that permit in any forum, including but

not limited to any judicial or administrative proceeding, within 60 days of issuance, Plaintiffs shall be deemed to have forever waived their right to challenge that permit.  In the event that any or all Plaintiffs initiate a judicial, administrative or any other legal proceeding in any forum challenging a Clean Water Act Section 404 permit for the Huff Creek Surface Mine, the provisions of Paragraphs 54 through 58 of this Second Modified Consent Decree related to restrictions on Large Scale Surface Mining shall immediately terminate.  Provided, however, that Plaintiffs may challenge a Clean Water Act Section 404 permit for the Huff Creek Surface Mine without the restrictions on Large Scale Surface Mining set forth Paragraphs 54 through 58 herein terminating if Region III of the United States Environmental Protection Agency, in writing and pursuant to 33 C.F.R. §320.4(d), advises the U.S. Army Corps of Engineers of water quality aspects to be taken into consideration and does not subsequently indicate that those considerations have been addressed.   In the event that EPA expresses such concerns and Plaintiffs challenge a Clean Water Act Section 404 permit for the Huff Creek Surface Mine on those grounds, then the restrictions on Large Scale Surface Mining set forth in Paragraphs 54 through 58 of this Second Modified Consent Decree shall remain in full force and effect.

61.     Notwithstanding any other provision of this Second Modified Consent Decree, including the terms of Paragraph 25, the restrictions on Large Scale Surface Mining set forth in Paragraphs 54 through 58 shall apply to Substituted Defendant and its Affiliated Companies;  *provided*, *however*, that nothing in this Second Modified Consent Decree shall be construed to extend any obligation of Substituted Defendant to any of its Affiliated Companies with respect to performing any selenium treatment or other environmental compliance obligation that is not already so extended.   The selling, transferring, spinning off, or otherwise relinquishing control of Substituted Defendant or an Affiliated Company shall not

42

relieve that entity from the limitations on Large Scale Surface Mining established in Paragraphs 54 through 58 of this Second Modified Consent Decree. Provided, however, that the limitations on Large Scale Surface Mining shall not apply to or bind any Substituted Defendant or any of its Affiliated Companies that are sold, spun off, transferred or otherwise separated from their parent in liquidation in bankruptcy. The limitations on Large Scale Surface Mining shall not transfer to (a) any purchaser of any asset (other than stock) of Substituted Defendant or any of its Affiliated Companies or any of such purchaser's other subsidiaries or affiliates or (b) any purchaser of the stock of either Substituted Defendant or any of its Affiliated Companies or any of such purchaser's other subsidiaries or affiliates (but after such stock purchase shall continue to apply to Substituted Defendant and its Affiliated Companies after such purchase, except as provided in the preceding sentence). Provided, however, that if Substituted Defendant and/or any of its Affiliated Companies cease to exist for any reason, the limitations on Large Scale Surface Mining, including the provisions of Paragraphs 54 through 58, shall remain applicable to the mines owned and/or operated by Patriot Coal Corporation or any of its subsidiaries on May 12, 2015 as if Substituted Defendant or the relevant Affiliated Company or Companies still existed.

62. Beginning in 2013 and continuing through 2023, Substituted Defendant shall provide Plaintiffs with annual reports summarizing the status of its efforts to comply with Section VIII of the Second Modified Consent Decree, and such reports shall be provided according to a schedule to be determined by the Parties. The Parties agree that the schedule can be modified upon agreement by the Parties at any point and without modifying this Second Modified Consent Decree, and that the Parties may reduce the frequency of this reporting requirement or delete it all together. Beginning in 2024, Substituted Defendant shall provide Plaintiffs with an annual report only after Plaintiffs collectively request such a report.

63.     Notwithstanding any other provision of this Second Modified Consent Decree, from the Effective Date of this Second Modified Consent Decree, Substituted Defendant and its Affiliated Companies shall not conduct Surface Mining at any location formerly owned or operated by Patriot Coal Corporation or one of Patriot Coal Corporation's subsidiaries, except that Surface Mining necessary and incidental to reclamation.  To the extent there is a conflict between this Paragraph 63 and any other Paragraph in Section VIII of this Second Modified Consent Decree, Paragraph 63 shall control.

## IX.  STIPULATED PAYMENTS

64.     Substituted Defendant shall be liable for stipulated payments for the violations set forth in Paragraphs 65 to 68 and in the amounts set forth therein, unless excused under Section X ("Force Majeure").

65.     Substituted Defendant shall be liable for stipulated payments for (a) a failure to timely comply with a technology selection date with respect to a Covered Outfall as set forth on Appendix C, and (b) a failure to timely comply with any deadline set forth in the GANTT charts developed pursuant to Paragraphs 37, 40, and 42 for any Selected Technology, Alternative Technology, or Replacement Technology in the amounts set forth in this Paragraph.

> a.  For the first thirty (30) days after a deadline is missed, payments shall accrue at a rate of $750 per day per violation.
>
> b.  For days 31 to 60 after a deadline is missed, payments shall accrue at a rate of $1,500 per day per violation.
>
> c.  From day 61 and thereafter, payments shall accrue at a rate of $2,500 per day per violation.

66.     Violations of a selenium discharge limit in a Covered Permit for a Covered Outfall that occur after the compliance date set forth for that Covered Outfall in Appendix C but before the termination of this Second Modified Consent Decree with respect to that Covered Outfall shall be subject to the following stipulated payments.

    a.  Violations of the monthly average discharge limit shall accrue at

        i.  $6,000 if the treatment technology in use at the Covered Outfall is a Listed Technology

        ii.  $25,000 if the treatment technology in use at a Category I or II Covered Outfall in violation is not a Listed Technology

        iii.  $27,500 if the treatment technology in use at a Category III Covered Outfall in violation is not a Listed Technology

        iv.  $32,500 if the treatment technology in use at a Category IV Covered Outfall in violation is not a Listed Technology

        v.  $37,500 if the treatment technology in use at a Category V Covered Outfall in violation is not a Listed Technology.

    b.  Violations of the maximum daily discharge limit shall accrue at

        i.  $3,000 if the treatment technology in use at the Covered Outfall is a Listed Technology

        ii.  $12,500 if the treatment technology in use at a Category I or II Covered Outfall in violation is not a Listed Technology

iii. $13,750 if the treatment technology in use at a Category III Covered Outfall in violation is not a Listed Technology

iv. $16,250 if the treatment technology in use at a Category IV Covered Outfall in violation is not a Listed Technology

v. $18,750 if the treatment technology in use at a Category V Covered Outfall in violation is not a Listed Technology.

67.    A daily maximum violation or monthly average violation as reported on Substituted Defendant's DMRs shall constitute one (1) violation for purposes of this Section such that Substituted Defendant shall not be subject to more than one (1) monthly average violation and two (2) daily maximum violations per month at any Covered Outfall.

68.    In addition to the stipulated payments listed in Paragraphs 65 and 66, Substituted Defendant shall be liable for a one-time stipulated payment of $25,000 for any Category I Covered Outfall, $50,000 for any Category II Covered Outfall, $75,000 for any Category III Covered Outfall, $150,000 for any Category IV Covered Outfall, or $250,000 for any Category V Covered Outfall where (1) Substituted Defendant has been required to implement an Alternative Abatement Plan pursuant to Paragraph 41; (2) has not completed installation of the Alternative Technology identified in the Alternative Abatement Plan by the compliance date for that Covered Outfall set forth in Appendix C; and (3) violates a maximum daily or monthly average permit limit before completing installation of the Alternative Technology.

69.    Accrued stipulated payments shall be satisfied in full through payment as set forth in Paragraph 72.

70.     Plaintiffs may, in the unreviewable exercise of their discretion, reduce or waive stipulated payments otherwise due under this Second Modified Consent Decree.

71.     Notwithstanding Substituted Defendant's liability for stipulated payments as described in Paragraphs 65 through 68, Plaintiffs reserve the right to seek other legal and equitable remedies, including contempt, if Substituted Defendant misses the deadlines stated in those paragraphs.

72.     Substituted Defendant shall submit stipulated payments due as a result of noncompliance under Paragraphs 65 through 68 above at the end of the thirty (30)-day period following the conclusion of each calendar quarter (i.e., by April 30, July 31, October 31 and January 31).  Substituted Defendant shall make the payments required by Section IX by certified check, bank check, or money order to the West Virginia Land Trust and shall send the funds to the following address:

> West Virginia Land Trust
> PO Box 11823
> Charleston, WV 25339-1823

The check or money order shall reference Ohio Valley Environmental Coalition, et al. v. Patriot Coal Corp., et al., Civil Action No. 3:11-cv-00115, and payment shall be considered complete upon mailing, or direct delivery to the specified address.  A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made and shall state that payment is being made pursuant to this Decree.

## X.  FORCE MAJEURE

73.     "Force Majeure," for purposes of this Second Modified Consent Decree, is defined as any event arising from causes beyond the reasonable control of Substituted Defendant, of any entity controlled by Substituted Defendant, or of Substituted Defendant's contractors,

which delays or prevents the performance of any obligation under this Second Modified Consent Decree despite Substituted Defendant's best efforts to fulfill the obligation. The requirement that Substituted Defendant exercise "good faith efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include Substituted Defendant's financial inability to perform any obligation under this Second Modified Consent Decree.

74.     If any event occurs or has occurred that may delay the performance of any obligation under this Second Modified Consent Decree, whether or not caused by a Force Majeure event, Substituted Defendant shall provide notice orally or by electronic or facsimile transmission to Plaintiffs within five (5) business days of when Substituted Defendant first knew that the event is likely to cause a delay. Within fourteen (14) days thereafter, Substituted Defendant shall provide in writing to Plaintiffs an explanation of the reasons for the delay; the anticipated duration of the delay; and actions taken or to be taken to prevent or minimize the delay.

75.     If Plaintiffs agree that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Second Modified Consent Decree that are affected by the Force Majeure event will be extended by Plaintiffs for such time as is necessary to complete those obligations.   An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.   Plaintiffs will notify Substituted Defendants in

48

writing within five (5) business days of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

76.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, Plaintiffs will notify Substituted Defendant in writing of its decision with five (5) days of its receipt of the Force Majeure claim by Substituted Defendant. Any dispute between the Parties over a Force Majeure claim may be resolved by the Special Master and any decision of the Special Master may be appealed to the Court in accordance with Paragraph 98.

## XI.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

77.     This Second Modified Consent Decree resolves the civil claims of Plaintiffs for the violations alleged in the Amended Complaint, filed on April 14, 2011, as well as for violations of the Covered Permits that were reported on discharge monitoring reports through the effective date of this Second Modified Consent Decree.

78.     For the term of the Second Modified Consent Decree for each Covered Outfall or Covered Permit, Plaintiffs shall waive all legal and equitable remedies available to enforce discharge, effluent, or water quality limits related to selenium contained in a Covered Permit except for any proceeding or action to enforce the Second Modified Consent Decree, except as to Outfall 019 of WV/NPDES Permit WV0093751.  Regarding that outfall, if at any time during the term of this Decree, the selenium concentration of the effluent discharged from Outfall 019 of WV/NPDES Permit WV0093751 exceeds the monthly average selenium effluent limitation in that permit in two (2) consecutive months, then that Permit shall be subject to the timeframes set forth in Appendix C and other requirements of this Decree for the appropriate category (based on flow) as measured from the date of the second consecutive monthly average

violation.   The Parties each respectively reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of the Second Modified Consent Decree.

79.     Except for the enforcement of the Second Modified Consent Decree, Plaintiffs shall refrain from filing a complaint against Substituted Defendant or its Affiliated Companies in Court pertaining to the enforcement of any discharge, effluent, or water quality limits related to selenium hereinafter included in any CWA permit identified in Appendix E for 12 months following the date upon which such effective and enforceable permit limits came into effect in the relevant CWA permit.   For any such outfall, Plaintiffs shall provide Substituted Defendant with the opportunity to meet and confer regarding Substituted Defendant's plans to come into compliance at such outfalls at least sixty (60) days before filing a Notice of Intent to Sue under the CWA and/or SMCRA.   Plaintiffs obligation to refrain from filing a complaint as described above shall not apply:

> a.   if Substituted Defendant or their subsidiaries have not received effective and enforceable permit limits within twelve (12) months of the expiration date of any permit identified in Appendix E, unless the delay in the incorporation of effective and enforceable permit limits is attributable solely to causes beyond the reasonable control of Substituted Defendant or its Affiliated Companies and if Substituted Defendant has submitted timely and substantially complete applications and have taken all other actions necessary to obtain the renewal or reissuance of the subject permit or permits. Whether the delay is attributable solely to causes beyond the reasonable control of Substituted Defendant or its Affiliated

Companies shall be determined in accordance with the provisions of Section X of this Second Modified Consent Decree ("Force Majeure"). For any such outfall, Plaintiffs shall provide Substituted Defendant with the opportunity to meet and confer regarding Substituted Defendant's plans to come into compliance at such outfalls at least sixty (60) days before filing a Notice of Intent to Sue under the CWA and/or SMCRA; or

b. if Substituted Defendant or its Affiliated Companies obtain a schedule of compliance from WVDEP for selenium effluent limitations, whether through a judicial decree or through a permit condition, that is inconsistent with the timeframes and other provisions of this Decree.

Plaintiffs shall not oppose Substituted Defendant's efforts to seek an extension of any schedule of compliance for selenium effluent limitations for any outfall identified in Appendix E, so long as the sought modification would render the schedule of compliance identical to the deadlines in Appendix C of this Second Modified Consent Decree.  Plaintiffs' agreement not to oppose Substituted Defendant's efforts to extend such schedules of compliance is limited to not filing adverse public comments, appealing permit modifications (so long as such modifications are identical to the extended deadlines in Appendix C of this Second Modified Consent Decree), filing citizen suits opposing such extensions, or petitioning USEPA or other federal agencies to object to such extensions.

80.     The provisions of this Section (including the limitations on new litigation set forth therein) apply to any new judicial or administrative proceeding (or any new interpleader

or joinder of Substituted Defendant or its Affiliated Companies into an existing proceeding) having as its principal claim the violation of discharge, effluent, or water quality limits related to selenium contained in any CWA permits issued by state or federal agencies to Substituted Defendant or its Affiliated Companies. In the event that a civil action is brought against any other person under any theory or claim, and a Plaintiff would have the right to join Substituted Defendant or its Affiliated Companies, it will forego any right to do so in order to remain in compliance with this Section.

81.     The provisions of this Section (including the limitations on new litigation set forth therein) shall not apply to discharges, effluent, or water quality limitations related to selenium discharged from outfalls at any mine at which no mineral removal occurred before December 1, 2011.

82.     The provisions of this Section (including the limitations on new litigation set forth therein) shall not prohibit individuals who are members of Plaintiffs' organizations from prosecuting claims against Substituted Defendant or its Affiliated Companies for property damage or personal injury resulting from Substituted Defendant's (or its Affiliated Companies') selenium discharges from its coal mining operations.  Nothing in the Second Modified Consent Decree shall be interpreted as a waiver, compromise or settlement of any cause of action personal to Plaintiffs' individual members, under either statute or common law, for personal injury or property damage resulting from Substituted Defendant's selenium discharges.

83.     The provisions of this Section (including the limitations on new litigation set forth therein) above shall not prohibit nor shall they apply to legal actions brought or remedies sought by Plaintiffs against parties other than Substituted Defendant or its Affiliated Companies which might affect, directly or indirectly, Substituted Defendant's environmental or

mining permits or applications for the same, provided that Substituted Defendant and its Affiliated Companies are not a party to such actions or remedies.  If Plaintiffs bring such a legal action against, or seek any remedy from, a third party, such as but not limited to, the WVDEP, Substituted Defendant or its Affiliated Companies may, at their sole discretion, intervene in the action to protect their legal rights or to assert their interests, and this Second Modified Consent Decree shall not be deemed a waiver of any right, defense, or claim that Substituted Defendant or its Affiliated Companies might assert.  Substituted Defendant's (or its Affiliated Companies') right to intervene pursuant to this Paragraph shall not render an action or remedy under this paragraph subject to the provisions of Paragraph 79.

84.     Except as set forth in Paragraph 18, Paragraphs 54 through 58, Paragraph 63, and Paragraphs 77 through 83 with respect to Affiliated Companies, this Decree shall not limit or affect the rights of Plaintiffs or Substituted Defendant against any third parties not party to the Second Modified Consent Decree.

85.     Other than Affiliated Companies, this Second Modified Consent Decree would not be construed to create rights in, or grant any cause of action to, any third party not party to the Decree.

86.     Plaintiffs do not, by their consent to the entry of this Second Modified Consent Decree, warrant or aver in any manner that Substituted Defendant's compliance with any aspect of this Second Modified Consent Decree shall result in compliance with provisions of the Act, 33 U.S.C. §§ 1311, *et seq*., or with any other provisions of federal, state or local laws, regulations or permits.

87.     Except for the Loudon Property, nothing in this Second Modified Consent Decree creates any encumbrance or servitude on any real property, whether owned or leased, by

Substituted Defendant or its Affiliated Companies and no term, limitation or provision contained herein shall be construed to run with any real property.  To the extent any lessor claims that any terms of this Second Modified Consent Decree or compliance herewith constitutes a default under a lease that would allow the lessor to forfeit the lease or recover damages (a "Claim of Default"), then the term or compliance upon which the Claim of Default is based shall not apply to that lease held by Substituted Defendant or its Affiliated Companies.  Upon becoming aware of the Claim of Default, Substituted Defendant or its Affiliated Companies shall promptly provide Plaintiffs notice of the Excluded Term and any lease and/or permit impacted by it. Substituted Defendant or its Affiliated Companies shall provide additional notice at least ten days prior to commencing any activity on this lease that would have otherwise been prohibited by such term or compliance.

## XII.  COSTS

88.    As required pursuant to Paragraph 60 of the Consent Decree, and in accordance with the fee-shifting provisions of the CWA and SMCRA, Defendants timely paid attorneys' and expert witness fees in the amount of $ 59,807.70 in full consideration and settlement of any claim of Plaintiffs for attorneys and expert witness fees, costs and expenses incurred up to the effective date of the Consent Decree.  In addition to attorney fees, Plaintiffs' costs and expert expenses were $ 2,860.20.

89.    Pursuant to Paragraph 61 of the Consent Decree, Defendants further agreed to pay Plaintiffs reasonable costs, including attorneys' fees and expert witness expenses, for their work conducted after the effective date of the Consent Decree and related to (a) monitoring Patriot's compliance with and implementation of the Consent Decree and (b) proceedings to interpret or enforce the terms of the Consent Decree.  As of the effective date of

the Modified Consent Decree those costs were $96,125.40. In addition to attorney fees, Plaintiffs' costs and expenses between July 9, 2012 and the entry of the Modified Consent Decree were $1,125.40. Patriot paid $96,125.40 in accordance with Paragraph 77 of the Modified Consent Decree. Moreover, Patriot paid Plaintiffs' reasonable costs for their work conducted after the Effective date of the Modified Consent Decree incurred up to and including December 31, 2014 pursuant to Paragraph 78 of the Modified Consent Decree.

90.     Substituted Defendant agrees to pay Plaintiffs reasonable costs, including attorneys' fees and expert witness expenses, for their work conducted after the Effective Date of the Second Modified Consent Decree and related to (a) monitoring Substituted Defendant's compliance with and implementation of the Second Modified Consent Decree and (b) proceedings to interpret or enforce the terms of the Second Modified Consent Decree. On approximately a quarterly basis, Plaintiffs shall present Substituted Defendant with a reasonable written description of all fees and expenses for which Plaintiffs seek payment, and Substituted Defendant shall pay undisputed amounts within thirty (30) days of receipt of such written description. If there are amounts in dispute, Plaintiffs may submit a fee petition to the Court for such disputed amounts, and Substituted Defendant reserves all rights to challenge the disputed amounts, including any objections to the reasonableness of rates charged, or the time, effort, or staffing associated with the disputed amounts. The Parties recognize that monitoring compliance and implementation of the Second Modified Consent Decree will require significant time of the Plaintiffs and their representatives.

91.     Substituted Defendant's payments under Paragraphs 89 and 90 shall be made by delivering a check for the amount payable to Appalachian Mountain Advocates, as attorneys of record for Plaintiffs. Appalachian Mountain Advocates shall be wholly responsible

for the proper distribution of any portions of the delivered sum to any and all other attorneys, experts or other entities who may be entitled thereto.

### XIII.  SPECIAL MASTER

92.    Pursuant to Federal Rule of Civil Procedure 53(a)(1)(A), the Parties consented in the Consent Decree to the appointment of a Special Master for the purposes set forth in this Section, and the Court found such an appointment to be an appropriate and efficient use of judicial resources.  On March 23, 2012, James Kyles was approved by the Court to serve as the Special Master, and he currently continues to serve in that function.

93.    In the event that Special Master Kyles resigns from his duties under the Second Modified Consent Decree, pursuant to Fed. R. Civ. P. 53(b), the parties shall submit names of recommended Special Masters to the Court within thirty (30) days of notice of his resignation, and the Court shall issue an order appointing a Special Master in conformance with the terms of this Modified Consent Decree.  In the event of a disagreement among the Parties, the Court may appoint a Special Master as described in Paragraph 94.

94.    In the event of a disagreement among the Parties as to the selection of a Special Master, each side shall present to the other the names of three candidates.  The opposing side would then select one candidate to be presented to the Court, resulting in two names presented to the Court without indication to the Court of which Party prefers which candidate. The Court would then pick from the remaining two candidates or require the parties to submit additional names.

95.    Substituted Defendant will bear the costs and fees associated with the Special Master.

56

96.     The Special Master shall have the authority to carry out his or her obligations under this Second Modified Consent Decree, including, but not limited to:

    a.   Review of Substituted Defendant's determination that compliance is or will be achieved without additional treatment at one or more Covered Outfalls under Paragraph 35;

    b.   Review of and dispute resolution regarding schedules and plans submitted under Paragraph 36;

    c.   Determinations that a proposed technology should be a Listed Technology as set forth in Paragraph 39 of this Second Modified Consent Decree;

    d.   Review and approval of Alternative Abatement Plans submitted under Paragraph 40(b);

    e.   Determinations as to whether an Alternative Abatement Plan is needed with respect to ZVI-type systems under Paragraph 40(c);

    f.   Review of Selected Technologies for Categories IV and V Covered Outfalls under Paragraph 40(d);

    g.   Review of Substituted Defendant's proposal for continued use of a Selected Technology under Paragraph 41;

    h.   Review of Substituted Defendant's choice of a Replacement Technology under Paragraph 42;

    i.   Disputes between the Parties with respect to the termination of this Second Modified Consent Decree for a particular Covered Outfall as set forth in Paragraph 43;

j.   Review of bi-monthly progress reports from Substituted Defendant as set forth in Paragraph 44;

k.   Any other specific dispute or issue regarding compliance with or request for relief from the terms of the Second Modified Consent Decree that, upon motion from a Party, the Court may refer to the Special Master;

l.   Conduct site visits as he or she deems appropriate to fulfill his or her duties as set forth in this Paragraph;

m.   Schedule and conduct meetings among the Parties;

n.   Request and review any data or information necessary to reach decisions or resolve disputes;

97.    With respect to those disputes to which Paragraph 96(k) may apply, the Party raising the dispute must first present the other Parties with written notice of any dispute or request for relief from the terms of this Decree.  The Party receiving notice shall have fourteen (14) days to respond.  If that Party does not respond, or if the notifying Party is not satisfied with the response, the notifying Party may seek relief from the Court, including the Court's direction that the dispute be referred to the Special Master.

98.    If any party is dissatisfied with the Special Master's resolution of a dispute or any other decision or determination made by the Special Master, it may request that the Court resolve the matter de novo.  Any Party moving for the Court for resolution of a matter on which the Special Master has issued a written determination or recommendation shall submit to the Court the Special Master's recommendation together with any submissions made by the Parties to the Special Master and any evidence relevant thereto.

99.    Pursuant to Fed. R. Civ. P. 53, the Special Master may communicate ex parte with the Court in the performance of his or her duties.

100.    In resolving disputes or making recommendations, the Special Master shall set forth his or her determination or recommendation in writing, together with the reasons therefore, and shall provide such written determination or recommendation to the Parties and the Court.

## XIV.  NOTICES

101.    Unless otherwise specified herein, whenever notifications, submissions, reports or communications are required by this Second Modified Consent Decree, they shall be made in writing and addressed as follows:

To Plaintiffs:

Derek Teaney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901

To Substituted Defendant:

Tom Clarke, President
PO Box 87
Natural Bridge, VA  24578

With a copy to:

Chris Hunter, Counsel for ERP Environmental Fund, Inc.
500 Lee St. E. Suite 1600
Charleston, WV 25301

102.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

103.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Second Modified Consent Decree or by mutual agreement of the Parties in writing.

## XV.  EFFECTIVE DATE

104.    The Effective Date of this Second Modified Consent Decree shall be the date upon which this Second Modified Consent Decree is entered by the Court or a motion to enter this Second Modified Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XVI.  RETENTION OF JURISDICTION

105.    The Court shall retain jurisdiction over this case until termination of this Second Modified Consent Decree with respect to all Covered Outfalls, for the purpose of resolving disputes arising under this Decree or entering orders modifying this Decree, pursuant to Section XVII ("Modification") or effectuating or enforcing compliance with the terms of this Decree.

106.    Plaintiffs and Substituted Defendant reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Second Modified Consent Decree.

## XVII.  MODIFICATION

107.    The terms of this Second Modified Consent Decree, including the attached appendices, may be modified only by a subsequent written agreement signed by all Parties. Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

## XVIII.  TERMINATION

108.    Unless otherwise specified in this Decree, this Second Modified Consent Decree shall terminate when Substituted Defendant has achieved compliance with the selenium effluent limitations at all Covered Outfalls for at least six consecutive months, but shall terminate as to individual outfalls when they have achieved compliance for at least six consecutive months in accordance with Paragraph 43.

## XIX.  SIGNATORIES/SERVICE

109.    Each undersigned representative of Plaintiffs and Substituted Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Second Modified Consent Decree and to execute and legally bind the Party he or she represents to this document.

110.    This Second Modified Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

## XX.  INTEGRATION

111.    This Second Modified Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.   Other than deliverables that are subsequently submitted and approved pursuant to this Decree, no other document, nor any representation, inducement, agreement, understanding or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

## XXI.  FINAL JUDGMENT

112.    Upon approval and entry of this Second Modified Consent Decree by the Court, this Second Modified Consent Decree shall constitute a final judgment of the Court as to

Plaintiffs and Substituted Defendant.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXII.  APPENDICES

113.    The following Appendices are attached to this Second Modified Consent Decree as appendices and are part of this Second Modified Consent Decree:

Appendix A — Table of Covered Outfalls

Appendix B — Description of SEP

Appendix C — Covered Outfalls by Category, With Applicable Deadlines

Appendix D — Jupiter Callisto Reclamation Plan (Doc. # 49)

Appendix E — List of Outfalls Subject to Paragraph 67

Appendix F – Selenium Settlement Agreement.


ENTER: _____, 2016


_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

For the Plaintiffs Ohio Valley Environmental Coalition, Inc., West Virginia Highlands Conservancy, Inc., and Sierra Club

**/s/ Derek O. Teaney**                                    Dated: **August 19, 2016**
DEREK O. TEANEY (WV Bar No. 10223)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-793-9007

**/s/ Joseph M. Lovett**                                  Dated: **August 19, 2016**
JOSEPH M. LOVETT (WV Bar No. 6926)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-645-9006

For Substituted Defendant ERP Environmental Fund, Inc.

**/s/ Christopher M. Hunter**                                  Dated: **August 19, 2016**
CHRISTOPHER M. HUNTER (WV Bar No. 9768)
JACKSON KELLY, PLLC
1600 Laidley Tower
Post Office Box 553
Charleston, West Virginia 25322
304-340-1381

**APPENDIX A**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---------|-------------------------------------|------------------|
| Hobet | WV0099392 | 004, 014, 015, 027, 028, 034, 035, 037, 038, 040, 045, 046, 077, 079 and 084 |
| Hobet | WV1016776 | 001, 002, 003, 004, 006, 007, 041 and 050 |
| Hobet | WV1017225 | 004 |
| Hobet | WV1020889 | 001, 003, and 005 |
| Hobet | WV1021028 | 006 |
| Catenary | WV0093751 | 003, 005 and 026 |
| Catenary | WV0096920 | 001 |
| Catenary | WV0096962 | 001, 042, 044, 055 and 056 |
| Catenary | WV1014684 | 001, 002, 003 and 006 |
| Apogee | WV0099520 | 001 and 011 |

**Page 1 of 1**

## APPENDIX B

**Proposal Supplemental Environmental Project**

**Document Number 51, Appendix B, pages 47-55 in
Record of Civ. No. 2:11-cv-115 (S.D. W. Va.)**

**Incorporated by reference as if fully set forth herein.**

## APPENDIX C

**CATEGORY I** (0-200 gpm)

**Technology Selection Date (if necessary) –** September 1, 2013
**Category Compliance Date –**September 15, 2018 (except for WV1020889, Outfalls 001 and 005)

**Category I Covered Outfalls**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---------|--------------------------------------|------------------|
| Hobet | WV0099392 | 015, 028, 034, 035, 045, 046, 077, 079 and 084* |
| Hobet | WV1016776 | 002, 003, 004, 006, 007 and 041 |
| Hobet | WV1020889 | 001,** 003, and 005** |
| Hobet | WV1021028 | 006 |
| Catenary | WV0093751 | 003 |
| Catenary | WV0096962 | 042 and 055 |
| Catenary | WV1014684 | 006 |
| Apogee | WV0099520 | 011 |

\*      WV 0099392, Outfall 084 to be evaluated for compliance by August 1, 2014.
\*\*     Pursuant to the First Addendum to the Modified Consent Decree (CM/ECF # 89-1), flows from WV1020889 Outfalls 001 and 005 will be consolidated with and discharged through WV1016776 Outfall 001, a Category IV Outfall, and thus the Category Compliance Date for WV1020889 Outfalls 001 and 005 shall be November 15, 2020.

///

///

///

///

///

///

**Page 1 of 3**

**CATEGORY II** (201-400 gpm)

**Technology Selection Date (if necessary) –** December 31, 2013
**Category Compliance Date –** September 15, 2019 (except for WV0099392, Outfall 027)

**Category II Covered Outfalls**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---|---|---|
| Hobet | WV0099392 | 014 and 027* |
| Catenary | WV0093751 | 005 and 026 |
| Catenary | WV0096920 | 001 |
| Catenary | WV0096962 | 056 |
| Catenary | WV1014684 | 001, 002 and 003 |

\*      Pursuant to the First Addendum to the Modified Consent Decree (CM/ECF # 89-1), the Category Compliance Date for WV0099392 Outfall 027 shall be September 15, 2018.

**CATEGORY III** (401-600 gpm)

**Technology Selection Date (if necessary) –** March 31, 2014 (except for WV1017225, Outfall 004)
**Category Compliance Date –** June 15, 2020 (except for WV1017225, Outfall 004)

**Category III Covered Outfalls**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---|---|---|
| Hobet | WV0099392 | 037 and 038 |
| Hobet | WV1016776 | 050 |
| Hobet | WV1017225 | 004* |
| Apogee | WV0099520 | 001 |

\*      Compliance Date for WV 1017225, Outfall 004: August 1, 2018.

///

///

**Page 2 of 3**

**CATEGORY IV** (601-1000 gpm)

**Technology Selection Date (if necessary) –** May 15, 2015
**Category Compliance Date –** November 15, 2020  (except for WV0099392 Outfalls 004 and 040)

**Category IV Covered Outfalls**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---------|-------------------------------------|------------------|
| Hobet | WV0099392 | 004* and 040* |
| Hobet | WV1016776 | 001 |

\*       Pursuant to the Second Addendum to the Modified Consent Decree (CM/ECF # 89-2), with respect to WV009392 Outfalls 004 and 040:
   a. For the purposes of the Technology Selection Date of September 1, 2014, Biochemical Reactor ("BCR") treatment technology may be selected and it shall be considered a Listed Technology for these two outfalls under Paragraph 38; provided that, the stipulated penalties listed in Paragraph 65 of this Second Modified Consent Decree shall apply as though BCR is not a Listed Technology for these two outfalls unless the Special Master approves BCR as a Listed Technology for Category III Outfalls.  If such approval is not given by December 31, 2014, these outfalls shall be subject to the alternative treatment submission requirements of Paragraph 40 of this Second Modified Consent Decree;
   b. The Category Compliance Date for WV009392 Outfall 004 shall be June 30, 2020; and
   c. The Category Compliance Date for WV009392 Outfall 004 shall be September 15, 2020.

**CATEGORY V** (1000+ gpm)

**Completion of Water Management and Technology Evaluation –** June 30, 2015
**Technology Selection Date (if necessary) –** September 1, 2015
**Category Compliance Date –** September 15, 2021

**Category V Covered Outfalls**

| Company | Covered Permits WV/NPDES Permit No. | Covered Outfalls |
|---------|-------------------------------------|------------------|
| Catenary | WV0096962 | 001 and 044 |

**Page 3 of 3**

## <u>APPENDIX D</u>

**Jupiter Callisto Reclamation Plan**

**Document Number 49 in Record of Civ. No. 3:11-cv-115 (S.D. W. Va.)**

**Incorporated by reference as if fully set forth herein.**

# APPENDIX E

| Company/Permit No. | Outlet |
|---|---|
| Apogee Coal Co., LLC/WV1020510 | 024 |
| Apogee Coal Co., LLC/WV1020510 | 018 |
| Apogee Coal Co., LLC/WV1020510 | 026 |
| Apogee Coal Co., LLC/WV1020510 | 013 |
| Apogee Coal Co., LLC/WV1022792 | 016 |
| Apogee Coal Co., LLC/WV1020510 | 028 |
|  |  |
| Coyote Coal Co., LLC/WV0094439 | 002 |
| Coyote Coal Co., LLC/WV0094439 | 015 |
| Coyote Coal Co., LLC/WV0094439 | 017 |
| Coyote Coal Co., LLC/WV1019261 | 001 |
|  |  |
| Catenary Coal Co., LLC/WV1019309 | 001 |
| Catenary Coal Co., LLC/WV1015338 | 002 |
|  |  |
| Colony Bay Coal Co./WV0068748 | 033 |
| Colony Bay Coal Co./WV0058238 | 001 |
| Colony Bay Coal Co./WV0068748 | 001 |
| Colony Bay Coal Co./WV0058238 | 002 |
| Colony Bay Coal Co./WV0068748 | 029 |
|  |  |
| Kanawha Eagle Coal, LLC/WV0065137 | 001 |
|  |  |
| Midland Trail Energy, LLC/WV0052426 | 001 |
|  |  |
| Panther, LLC/WV0048097 | 002 |

## APPENDIX F

**Selenium Settlement Agreement**

## Selenium Settlement Agreement

This Settlement Agreement is entered into this 19th day of August, 2016 by and among the Ohio Valley Environmental Coalition, Inc., Sierra Club, and the West Virginia Highlands Conservancy (collectively "the Plaintiffs") and the VCLF Land Trust, Inc. ("VCLF") and ERP Environmental Fund, Inc. ("ERP"). VCLF and ERP enter into this Settlement Agreement with the Plaintiffs, which provides for scheduled cash payments and the transfer of real estate to an agreed upon escrow agent in accordance with a separately executed Escrow Agreement, in exchange for a modification to the timeframes established in the January 9, 2013 Modified Consent Decree ("MCD") entered in *OVEC, et al. v. Patriot, et al.,* 3:11-cv-00115 (the "Patriot Litigation") and the December 21, 2012 Order entered in *OVEC, et al. v. Hobet Mining, LLC*, 3:09-cv-1167 (the "Hobet Litigation"), for compliance with selenium permit limits at the outfalls specified in the MCD and the December 21, 2012 Order.

## I. RECITALS

**1. Global Settlement Agreement.** Plaintiffs entered into a Global Settlement Agreement with Patriot Coal Corporation on November 15, 2012 establishing revised compliance deadlines for two separate Clean Water Act citizen suits: the Hobet Litigation and the Patriot Litigation.

**2. Modified Consent Decree.** The Parties submitted the Global Settlement Agreement to the United States District Court for the Southern District of West Virginia in the form of (1) the MCD, which was entered by the Court on January 9, 2013, and (2) a request to modify the Court ordered deadline in the Hobet Litigation. With regard to the Hobet Litigation, the Court issued an Order on December 21, 2012 that extended the final compliance deadline to August 1, 2014. As to the Patriot Litigation (3:11-cv-00115), the MCD grouped over forty outlets associated with Civil Action 3:11-cv-00115 into five categories according to volume of flow and established deadlines for selection of appropriate treatment technology and final compliance with selenium limits. The MCD also provided for the appointment of a Special Master to oversee compliance. Patriot's selection of biochemical reactor ("BCR") treatment technology for Categories I-V has been approved by the Special Master. Paragraph 66 of the MCD also referred to certain outlets listed in Appendix E. Plaintiffs agreed to refrain from filing suits against any Appendix E outlets for 12 months, provided that Patriot sought enforceable effluent limits for selenium within 12 months of entry of the MCD.

**3. Patriot Bankruptcy.** On May 12, 2015 Patriot Coal Corporation ("Patriot") and certain of its affiliates (collectively, the "Debtors") filed a petition with the United States Bankruptcy Court for the Eastern District of Virginia under chapter 11 of title 11 of the United States Code. *In re: Patriot Coal Corporation, et al.*, Case 15-32450-KLP (E.D. Va.). On September 18, 2015, Debtors filed the *Notice of Filing of Fourth Amended Disclosure Statement for Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("Fourth Amended Disclosure Statement"). Bankruptcy Docket No. 1333. The Fourth Amended Disclosure Statement included the August 16, 2015 Asset Purchase Agreement ("APA") between (1) the Debtors and (2) the Virginia Conservation Legacy Fund, Inc., and ERP Compliant Fuels, LLC, Bankruptcy Docket No. 1333, p. 315. The APA provided for the sale of certain assets from certain Patriot subsidiaries, including Hobet Mining, LLC ("Hobet"), Catenary Coal

4832-9276-7285.v1

Company, LLC ("Catenary"), and Apogee Mining Company, LLC ("Apogee") to the Virginia Conservation Legacy Fund, Inc., and ERP Compliant Fuels, Inc.

**4. Transfer of Permits to ERP.** Pursuant to the APA, the majority of surface mining permits and NPDES permits implicated by the MCD and the Hobet Litigation—including all of those associated with the Corridor G Mining Complex and the majority of the permits associated with the Logan County and Paint Creek complexes—are eventually to be transferred to ERP Environmental Fund, Inc. ("ERP"). *See* Bankruptcy Docket No. 1333, Schedule 2.01(g). Pursuant to a separate APA, Blackhawk Mining, LLC ("Blackhawk") acquired the Patriot assets not acquired by VCLF. The Blackhawk APA provides for the transfer of certain permits associated with former Patriot assets, including permits associated with approximately four outlets implicated by the MCD. ERP, Virginia Conservation Legacy Fund, Inc., and Blackhawk reached a separate agreement whereby ERP has acquired the selenium treatment obligations associated with the MCD outlets acquired by Blackhawk in exchange for reclamation services from Blackhawk. In accordance with Article IX.A of the Fourth Amended Plan, the occurrence of the Effective Date was conditioned upon, among other things, the closing of the Blackhawk and Virginia Conservation Legacy Fund, Inc. transactions. The Blackhawk transaction closed on or about October 26, 2016, and the Virginia Conservation Legacy Fund, Inc., transaction closed on or about October 27, 2016. Morover, all other conditions under the Fourth Amended Plan have been satisfied. Accordingly, on October 28, 2015, the Debtors filed the *Notice of (I) Confirmation of the Debtors' Chapter 11 Plan of Reorganization, (II) Occurrence of the Effective Date, and (III) Related Bar Dates* (the "Effective Date Notice"), which stated that the Effective Date of the Fourth Amended Plan occurred on October 26, 2015. On or about October 27, 2015, ERP Compliant Fuels, LLC, assigned (among other things) its obligations under the MCD and the December 21, 2012 Order in the Hobet Litigation to ERP pursuant to an Assignment and Assumption Agreement. Virginia Conservation Legacy Fund, Inc., transferred the interests and obligations that it obtained under the APA to VCLF on or about December 7, 2015. Accordingly, VCLF and its affiliate, ERP, have now assumed the selenium treatment obligations under the MCD and the December 21, 2012 Order in the Hobet Litigation.

**5. Necessity of Extension.** During the six-month period of Patriot's bankruptcy, Patriot was without the resources required to begin construction of the BCRs necessary to meet the final compliance deadlines for Category II outlets. Additionally, ERP's start-up capital has been less than anticipated. Given the time lost during Patriot's Chapter 11 process and its limited resources, ERP has been unable to construct BCRs in time to meet the MCD obligations it assumed or remedy existing states of noncompliance at mining operations subject to the MCD and Hobet Litigation.

## II. DEFINITIONS

**6. Definitions.** The following terms shall have the meanings set forth below in this Selenium Settlement Agreement.

> **Bankruptcy Court** shall mean the United States Bankruptcy Court for Eastern District of Virginia or other bankruptcy court of competent jurisdiction.

**Clean Water Act or CWA** shall mean the Federal Water Pollution Control Act, 33 U.S.C. §§1251 *et seq.* as in effect at the Effective Date.

**Corridor G Mining Complex** shall mean the existing and planned surface and underground mining and associated preparation plant and related facilities located in Boone and Lincoln Counties of West Virginia and proximately located to U.S. Route 119 in those counties.

**ERP** shall mean ERP Environmental Fund, Inc.

**Global Settlement Agreement** shall mean the November 15, 2012 Global Settlement Agreement between Patriot and Plaintiffs that ultimately resulted in the January 9, 2013 Modified Consent Decree.

**Highlands Conservancy** shall mean West Virginia Highlands Conservancy, Inc. (a West Virginia non-profit corporation).

**Hobet 21 Litigation** shall mean *OVEC, et al. v. Hobet Mining, LLC*., Civil Action No. 3:15-cv-04101 (S.D. W.Va.).

**Hobet Litigation** shall mean *Ohio Valley Envt'l Coalition, Inc. et al. v. Hobet Mining, LLC,* Civ. No. 3:09-cv-1167 (S.D. W.Va.).

**OVEC** shall mean the Ohio Valley Environmental Coalition, Inc. (an Ohio corporation).

**Plaintiffs** shall mean OVEC, Highlands Conservancy, and Sierra Club.

**Parties** shall mean OVEC, Highlands Conservancy, Sierra Club, VCLF, and ERP.

**Patriot** shall mean Patriot Coal Corporation and its subsidiaries, including, but not limited to, Apogee, Catenary, and Hobet.

**Patriot Litigation** shall mean *Ohio Valley Envt'l Coalition, Inc. et al. v. Patriot Coal Corp.,* Civ. No. 3:11-cv-00115 (S.D. W.Va.).

**Settlement Agreement** shall mean the current Selenium Settlement Agreement.

**Surface Mining** shall mean the removal of the earth and rock covering from the surface of the land to extract the coal beneath.

**Surface Mining Necessary for and Incidental to Reclamation** shall mean coal extraction performed in conjunction with, and to offset the cost of, the removal of overburden where the disturbance would not otherwise occur but for the need to generate material for the reclamation of highwalls, compliance with approximate original contour standards, or to meet other SMCRA reclamation obligations. Should a dispute arise

regarding whether mining is incidental to reclamation, the parties agree to defer to WVDEP guidance on the matter.

**SMCRA** shall mean the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 *et seq.* as in effect at the Effective Date.

**VCLF** shall mean VCLF Land Trust, Inc.

### III. HOBET 22 AND PATRIOT LITIGATION OBLIGATIONS

**7. Revisions to Court Order - Hobet 22 Litigation.** The Court's December 21, 2012 Order in the Hobet Litigation established a compliance deadline of August 1, 2014 for outlets associated with the Hobet 22 Litigation. Although Hobet completed construction of the agreed-upon treatment facilities at its Corridor G Mining Complex, the BCR has experienced certain operational issues that may necessitate the addition of a sand filter and certain other adjustments. No later than five business days after the execution of this Settlement Agreement, the Parties shall file a joint motion with the District Court to modify the above-referenced compliance date in the Hobet Litigation to August 1, 2018.

**8. Revisions to Court Order - Patriot Litigation.** The January 9, 2013 MCD established, among other things, the following compliance deadlines for outlets involved in the Patriot Litigation:

a. Category 1 – March 15, 2015;
b. Category 2 – March 15, 2016;
c. Category 3 – December 15, 2016;
d. Category 4 – May 15, 2017;
e. Category 5 – March 15, 2018.

No later than five business days after the execution of this Settlement Agreement, the Parties shall file a joint motion with the District Court to amend the January 9, 2013 MCD to extend the compliance dates in the Patriot Litigation as follows:

a. Category 1 – September 15, 2018;
b. Category 2 – September 15, 2019;
c. Category 3 – June 15, 2020;
d. Category 4 – November 15, 2020;
e. Category 5 – September 15, 2021.

Plaintiffs will not oppose those deadlines after lodging of the Decree. If, however, the Court, EPA, WVDEP, and/or any other responsible entity requires those deadlines to be shortened, this settlement shall remain in full force and effect so long as the deadline extension is between 36 and 42 months.

**9. Appendix E Outlets.** Patriot subsidiaries received enforceable effluent limits or compliance schedules for the outlets listed in Appendix E. ERP is obligated to fulfill Patriot's former

treatment obligations with respect to Appendix E outlets. Plaintiffs agree not to oppose ERP's efforts to seek an extension of the compliance deadlines for Appendix E, so long as they are identical to the compliance deadline extensions for the relevant Category or Categories described above. Plaintiffs' agreement not to oppose ERP's efforts to extend compliance deadlines for Appendix E is limited to not filing adverse public comments, appealing permit modifications so long as they are identical to compliance deadline extensions described above, filing citizen suits opposing those extensions, or petitioning EPA or other federal agencies to object to the extension of agreed to compliance deadlines applicable to Appendix E outlets.

**10.  Court Entry of Modified Consent Decrees.** The obligations of this Settlement Agreement are contingent upon the District Court providing the relief sought in Paragraphs 7 and 8. If the District Court fails to grant the relief sought pursuant to Paragraphs 7 and 8, this Settlement Agreement shall terminate, and the obligations set forth herein shall have no further force or effect. Provided, however, that if ERP and/or VCLF file a petition under either chapter 11 or chapter 7 of title 11 of the United States Code prior to the entry of orders by the District Court effectuating the relief sought in Paragraphs 7 and 8 of this Settlement Agreement, then any and all funds placed in Escrow pursuant to the Escrow Agreement prior to the date that ERP and/or VCLF file for bankruptcy shall become the sole property of and shall be released to Appalachian Headwaters, Inc., pursuant to the terms of the Escrow Agreement.

**11.  Effect of this Agreement on Hobet Litigation and Patriot Litigation.** Except as expressly set forth in Paragraphs 7 and 8, nothing in this Settlement Agreement shall modify the judgment and injunctive relief granted in the Hobet Litigation and Patriot Litigation.

## IV. CONDUCTIVITY LITIGATION

**12.       Effect of this Agreement on Hobet 21 Litigation.**  Plaintiffs filed *OVEC, et al. v. Hobet Mining, LLC.*, Civil Action No. 3:15-cv-04101 (S.D. W.Va.) ("Hobet 21 Litigation") on April 6, 2015.  The suit alleges violations of the CWA and SMCRA related to discharges of pollutants associated with conductivity emanating from approximately 20 permitted valley fills and 10 reclaimed fills at the Hobet 21 mine.  Plaintiffs agree to dismiss the Hobet 21 suit without prejudice within 15 days of entry of the sought amendment to the MCD by the Court.  Plaintiffs agree not to refile the Hobet 21 Litigation for at least forty-two (42) months from the date of entry of the sought amendment to the Modified Consent Decree.  This agreement is contingent upon VCLF adhering to the conditions of this settlement agreement.

## V. CONSIDERATION

**13. Monetary Donation to West Virginia Nonprofit.** VCLF agrees to donate $6,000,000 to Appalachian Headwaters, Inc.  VCLF shall complete the $6,000,000 donation in installment payments, as follows: Retroactive to May 1, 2016, VCLF shall place $125,000 per month on the first day of each month into Escrow pursuant to the terms of the Escrow Agreement.  Upon entry by the Court of an order granting the relief described in Paragraphs 7 and 8, the funds in Escrow shall be released to Appalachian Headwaters, pursuant to the Escrow Agreement.  On the first day of each month thereafter, through and including April 1, 2017, VCLF shall make a monthly donation to Appalachian Headwaters, Inc., in the amount of $125,000 per month.  On May 1,

2017, and on the first of each month thereafter, through and including October 1, 2019, VCLF shall make a monthly donation to Appalachian Headwaters, Inc., in the amount of $150,000 per month. Appalachian Headwaters's interest in the $6,000,000 donation, and VCLF's obligation to make the $6,000,000 donation's constituent installment payments, shall be secured by a perfected security interest in 100% of the shares of VCLF Loudoun Holdings, LLC. On or about August 17, 2016, Virginia Conservation Legacy Fund, Inc., a Virginia corporation, conveyed its right, title, and interest to 313 acres of land in Loudoun County, Virginia (the "Loudoun Property") to VCLF Loudoun Holdings, LLC (the "Virginia LLC"). VCLF is the present owner of VCLF Loudoun Holdings, LLC. Pursuant to the terms of the Escrow Agreement, VCLF shall deliver the certificate representing its membership interest in VCLF Loudoun Holdings, LLC to the Escrow Agent. In the event that VCLF fails to make any of the monthly payments described above within thirty (30) days of due date for that payment, such failure shall constitute an incurable default. In the event of such a default, pursuant to the terms of the Escrow Agreement, the Escrow Agent shall endorse the certificate of membership interest in VCLF Loudoun Holdings, LLC, to Appalachian Headwaters, Inc., and deliver that certificate to Appalachian Headwaters, Inc. In the event of default, defined as VCLF failing to make a scheduled payment within 30 days of its due date, the extensions referenced in Paragraphs 7 and 8 shall remain in effect. In such an event Appalachian Headwaters, Inc., may exercise all the rights of a secured creditor under the applicable Uniform Commercial Code. In addition, in connection with the Loudoun Property, at the option of Appalachian Headwaters, Inc., Appalachian Headwaters, Inc. may proceed in good faith, in a commercially reasonable manner, to cause the Virginia LLC to market the Loudoun Property and to extract the highest purchase price practicable from the sale of the property, and then, after such sale, may cause the Virginia LLC to pay to Appalachian Headwaters, Inc., the balance of the $6,000,000 referenced in this paragraph, net of all reasonable fees. Before any such sale Appalachian Headwaters shall give notice to VCLF as if under Section 9-611 of the Virginia Uniform Commercial Code (Va. Code 8.9A-611). VCLF's monthly payments shall be recalculated according to the new balance after sale of the Loudoun Property. In the event that the net proceeds of the Loudoun County property are greater than the outstanding balance of the $6,000,000 total donation amount, the excess shall be returned to VCLF by direct payment or by assignment of the Membership Interest in the Virginia LLC back to VCLF. Furthermore, in the event that default, as defined in this Paragraph, occurs prior to the entry of Orders by the District Court effectuating the relief sought in Paragraphs 7 and 8, then such a default shall be treated as if it had occurred on the day after the District Court enters such Orders, and the Plaintiffs have the right to instruct the Escrow Agent to deliver the Virginia LLC Certificate to the Plaintiffs, in accordance with the Escrow Agreement.

**14. No Additional Surface Mining.** In exchange for Plaintiffs' agreement not to pursue conductivity actions against former Patriot permits (¶ 12), VCLF agrees that ERP shall not conduct Surface Mining at any Patriot permits except Surface Mining Necessary for and Incidental to Reclamation.

**15. Reclamation Pilot Projects.**

      (a)    VCLF and ERP, together with Appalachian Headwaters, shall use their reasonable best efforts to identify locations upon permits held by ERP to test new or

innovative reclamation and/or stream mitigation techniques developed by
Appalachian Headwaters (collectively, the "Pilot Projects").

(i)     VCLF and ERP shall meet with Appalachian Headwaters within 30 days
        of the submission by Appalachian Headwaters of a list of potential Pilot
        Projects to discuss which Pilot Projects can be completed and to select
        appropriate locations for such Pilot Projects.

(ii)    VCLF and ERP understand that the ability to place a conservation
        easement upon the completion of a Pilot Project is an essential element of
        selecting a location for a Pilot Project.  Plaintiffs understand that VCLF
        and ERP may not have authority to commit to placing such conservation
        easements on leased properties and are unable to expend funds to purchase
        those rights.  Appalachian Headwaters and VCLF and ERP will work
        together in selecting locations where VCLF and ERP already have the
        authority to place conservation easements and, if necessary, to work with
        third-party property owners to secure such rights; provided that, nothing
        herein shall require VCLF and ERP to expend money in placing these
        conservation easements other than typical filing fees, recording fees,
        administrative fees, and taxes.  Unless waived by Appalachian Headwaters
        in its sole discretion, conservation easements shall be placed on land after
        the Pilot Projects are complete.

(b)     VCLF and ERP, together with Appalachian Headwaters, will target a minimum of
        250 acres of cumulative reclamation through the Pilot Projects and will work
        together to develop a budget for in-kind contributions and plan for each Pilot
        Project.  The Parties anticipate that priority will be given to sites where there are
        only reclamation activities left to complete.

(c)     VCLF and ERP agree to discuss with Appalachian Headwaters, Inc. in-kind
        contributions, including costs associated with operator, equipment time,
        maintenance and fuel, to complete Pilot Projects on mining sites controlled by
        VCLF or ERP, to the extent that such sites are selected for Pilot Projects.  VCLF
        and ERP will provide in-kind contributions of at least $300,000 per year in 2017,
        2018, and 2019.  VCLF agrees to grant Appalachian Headwaters a perfected
        security interest, in the form of a first-priority lien on a Bucyrus-Erie Model 2570
        drag line, which is currently located at its Catenary Mine Complex within one
        business day of the execution of this Selenium Settlement Agreement, to secure
        its obligation to provide $900,000 total of in-kind contributions.

## 16.    Long-Term Reclamation Collaboration

(a)     VCLF and ERP and their affiliates and Appalachian Headwaters will negotiate an
        agreement-in-principle (the "Agreement-in-Principle") to explore further
        opportunities to cooperate on reclamation of additional properties held by the
        VCLF and/or ERP.

4832-9276-7285.v1

(b)     The Agreement-in-Principle shall set forth the terms and conditions by which VCLF and ERP and Appalachian Headwaters shall attempt to expand the innovative techniques that are proved by the Pilot Projects to be successful to additional sites and cost-sharing issues related to additional costs associated with these techniques.

(c)     Assuming that appropriate sites can be identified, VCLF and ERP agree that they will provide, at their cost, machinery, maintenance, and labor for future Appalachian Headwaters projects that take place on property owned or controlled by VCLF and/or ERP. The obligation set forth in this paragraph is in addition to, and not in place of, the $900,000 total of in-kind contributions described in Paragraph 15(c), above.

(d)     Appalachian Headwaters and VCLF and ERP will use commercially reasonable efforts to negotiate and enter into a definitive agreement regarding the scope of future collaboration on reclamation projects within 9 months of the Court's entry of the relief sought in Paragraphs 7 and 8.

## VII. DISPUTE RESOLUTION

**17. Notice of Dispute**. If either the Plaintiffs (collectively) or ERP believe a dispute has arisen under this Agreement, then the Plaintiffs or ERP as the case may be, shall provide written notice of the issue they believe to be in dispute, the nature of the dispute, and the terms of this Settlement Agreement impacted by the dispute to the other Parties to this Agreement. Upon receipt of any such written notice, the Parties agree to move expeditiously and in good faith to seek to negotiate an acceptable resolution of the dispute for a period of twenty-one (21) days. If a dispute has not been satisfactorily resolved during the twenty-one (21) day period of good faith negotiations, at the conclusion of any such negotiation, any Party may ask the United States District Court for the Southern District of West Virginia, to whose jurisdiction the Parties hereby expressly and irrevocably consent, to enforce the Settlement Agreement. The sole relief available for any alleged violation of paragraph 9 or paragraph 12 shall be injunctive relief and not money damages.

## VIII. NOTICE

**18. Notice.** Any notice or other documents required or permitted to be given under the terms of this Settlement Agreement shall be deemed delivered (i) when received, if personally delivered; (ii) upon receipt of an electronic copy, facsimile, or other electronic transmission; or (iii) one business day after delivery thereof to a nationally recognized overnight delivery service which provides receipt of service addressed to the Parties as follows:

If to ERP or VCLF:

Tom Clarke, President
PO Box 87

4832-9276-7285.v1

Natural Bridge, VA 24578
(540) 204-1588
Tom.Clarke@Kissito.org

With a copy to:

Chris Hunter, Counsel for VCLF and ERP
500 Lee St. E. Suite 1600
Charleston, WV 25301
(304) 340-1203
chunter@jacksonkelly.com

If to OVEC, Highlands Conservancy, or Sierra Club:

Derek Teaney
Senior Attorney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304.793.9007 (Tel.)
304.645.9008 (Facsimile)
dteaney@appalmad.org

Any Party may unilaterally replace the person designated to receive notice on its behalf under this Selenium Settlement Agreement by sending written notice of such replacement to the other Parties.

## V. GENERAL TERMS

**19. Modification of this Settlement Agreement.** This Settlement Agreement may be modified only in writing and only by mutual consent of the Parties.

**20. Assignment.** The Plaintiffs may not assign their rights and obligations under this Settlement Agreement without the express written consent of the Parties, nor shall any third party succeed to the rights and obligations of the Plaintiffs under this Agreement without the express written consent of all Parties.

**21. Third Parties.** This Settlement Agreement is not intended for the benefit of any third party, except Appalachian Headwaters, Inc., and shall not be enforceable by any third party, except Appalachian Headwaters, Inc. Nothing in this Settlement Agreement is intended to bind any third party.

**22. Force Majeure.** "Force Majeure," for purposes of this Settlement Agreement, is defined as any event arising from causes beyond the reasonable control of ERP or VCLF, of any

4832-9276-7285.v1

entity controlled by ERP or VCLF, or of ERP or VCLF's contractors, which delays or prevents the performance of any obligation under this Settlement Agreement despite ERP and VCLF's best efforts to fulfill the obligation. The requirement that ERP and VCLF exercise "good faith efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include ERP or VCLF's financial inability to perform any obligation under this Global Settlement Agreement.

**23. Construction.** Questions regarding the interpretation of this Settlement Agreement shall not be resolved against any Party on the ground that this Agreement has been drafted by that Party. This Settlement Agreement is the result of review, negotiation, and compromise by each Party in consultation with competent counsel of its choosing.

**24. Authority to Enter Into Agreement.** The undersigned representative for each Party represents, certifies, and warrants that he or she is duly authorized by the Party whom he or she represents to enter into the terms of this Settlement Agreement and bind such Party legally to the Settlement Agreement.

**25. Execution in Counterparts.** This Settlement Agreement may be signed simultaneously or in counterparts by the respective signatories, which shall be fully valid and binding as if a single document was signed by all of the signatories, and the counterparts, together shall constitute one single document.

For VCLF Land Trust, Inc.
and ERP Environmental Fund, Inc. ("ERP"):


_____

Name:
Title:
Date:


For Ohio Valley Environmental Coalition, Inc.


_____

Name: Derek O. Teaney
Title: Counsel for Ohio Valley Environmental Coalition, Inc.
Date: August 19, 2016


For West Virginia Highlands Conservancy, Inc.


_____

Name: Derek O. Teaney
Title: Counsel for West Virginia Highlands Conservancy, Inc.
Date: August 19, 2016


4832-9276-7285.v1

For Sierra Club

Name: Derek O. Tearley
Title: Counsel for Sierra Club
Date: August 19, 2016

<u>**Selenium Settlement Agreement**</u>

This Settlement Agreement is entered into this 19th day of August, 2016 by and among the Ohio Valley Environmental Coalition, Inc., Sierra Club, and the West Virginia Highlands Conservancy (collectively "the Plaintiffs") and the VCLF Land Trust, Inc. ("VCLF") and ERP Environmental Fund, Inc. ("ERP").  VCLF and ERP enter into this Settlement Agreement with the Plaintiffs, which provides for scheduled cash payments and the transfer of real estate to an agreed upon escrow agent in accordance with a separately executed Escrow Agreement, in exchange for a modification to the timeframes established in the January 9, 2013 Modified Consent Decree ("MCD") entered in *OVEC, et al. v. Patriot, et al.,* 3:11-cv-00115 (the "Patriot Litigation") and the December 21, 2012 Order entered in *OVEC, et al. v. Hobet Mining, LLC*, 3:09-cv-1167 (the "Hobet Litigation"), for compliance with selenium permit limits at the outfalls specified in the MCD and the December 21, 2012 Order.

## I. RECITALS

**1.  Global Settlement Agreement.**  Plaintiffs entered into a Global Settlement Agreement with Patriot Coal Corporation on November 15, 2012 establishing revised compliance deadlines for two separate Clean Water Act citizen suits: the Hobet Litigation and the Patriot Litigation.

**2.  Modified Consent Decree.**  The Parties submitted the Global Settlement Agreement to the United States District Court for the Southern District of West Virginia in the form of (1) the MCD, which was entered by the Court on January 9, 2013, and (2) a request to modify the Court ordered deadline in the Hobet Litigation.  With regard to the Hobet Litigation, the Court issued an Order on December 21, 2012 that extended the final compliance deadline to August 1, 2014. As to the Patriot Litigation (3:11-cv-00115), the MCD grouped over forty outlets associated with Civil Action 3:11-cv-00115 into five categories according to volume of flow and established deadlines for selection of appropriate treatment technology and final compliance with selenium limits.  The MCD also provided for the appointment of a Special Master to oversee compliance. Patriot's selection of biochemical reactor ("BCR") treatment technology for Categories I-V has been approved by the Special Master.  Paragraph 66 of the MCD also referred to certain outlets listed in Appendix E.  Plaintiffs agreed to refrain from filing suits against any Appendix E outlets for 12 months, provided that Patriot sought enforceable effluent limits for selenium within 12 months of entry of the MCD.

**3.  Patriot Bankruptcy.**  On May 12, 2015 Patriot Coal Corporation ("Patriot") and certain of its affiliates (collectively, the "<u>Debtors</u>") filed a petition with the United States Bankruptcy Court for the Eastern District of Virginia under chapter 11 of title 11 of the United States Code.  *In re: Patriot Coal Corporation, et al.*, Case 15-32450-KLP (E.D. Va.).  On September 18, 2015, Debtors filed the *Notice of Filing of Fourth Amended Disclosure Statement for Debtors' Fourth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* ("Fourth Amended Disclosure Statement").  Bankruptcy Docket No. 1333.  The Fourth Amended Disclosure Statement included the August 16, 2015 Asset Purchase Agreement ("APA") between (1) the Debtors and (2) the Virginia Conservation Legacy Fund, Inc., and ERP Compliant Fuels, LLC, Bankruptcy Docket No. 1333, p. 315.  The APA provided for the sale of certain assets from certain Patriot subsidiaries, including Hobet Mining, LLC ("Hobet"), Catenary Coal

Company, LLC ("Catenary"), and Apogee Mining Company, LLC ("Apogee") to the Virginia Conservation Legacy Fund, Inc., and ERP Compliant Fuels, Inc.

**4.  Transfer of Permits to ERP.**  Pursuant to the APA, the majority of surface mining permits and NPDES permits implicated by the MCD and the Hobet Litigation—including all of those associated with the Corridor G Mining Complex and the majority of the permits associated with the Logan County and Paint Creek complexes—are eventually to be transferred to ERP Environmental Fund, Inc. ("ERP").  *See* Bankruptcy Docket No. 1333, Schedule 2.01(g). Pursuant to a separate APA, Blackhawk Mining, LLC ("Blackhawk") acquired the Patriot assets not acquired by VCLF.  The Blackhawk APA provides for the transfer of certain permits associated with former Patriot assets, including permits associated with approximately four outlets implicated by the MCD.  ERP, Virginia Conservation Legacy Fund, Inc., and Blackhawk reached a separate agreement whereby ERP has acquired the selenium treatment obligations associated with the MCD outlets acquired by Blackhawk in exchange for reclamation services from Blackhawk.  In accordance with Article IX.A of the Fourth Amended Plan, the occurrence of the Effective Date was conditioned upon, among other things, the closing of the Blackhawk and Virginia Conservation Legacy Fund, Inc. transactions.  The Blackhawk transaction closed on or about October 26, 2016, and the Virginia Conservation Legacy Fund, Inc., transaction closed on or about October 27, 2016.  Morover, all other conditions under the Fourth Amended Plan have been satisfied.  Accordingly, on October 28, 2015, the Debtors filed the *Notice of (I) Confirmation of the Debtors' Chapter 11 Plan of Reorganization, (II) Occurrence of the Effective Date, and (III) Related Bar Dates*  (the "Effective Date Notice"), which stated that the Effective Date of the Fourth Amended Plan occurred on October 26, 2015.  On or about October 27, 2015, ERP Compliant Fuels, LLC, assigned (among other things) its obligations under the MCD and the December 21, 2012 Order in the Hobet Litigation to ERP pursuant to an Assignment and Assumption Agreement.  Virginia Conservation Legacy Fund, Inc., transferred the interests and obligations that it obtained under the APA to VCLF on or about December 7, 2015.  Accordingly, VCLF and its affiliate, ERP, have now assumed the selenium treatment obligations under the MCD and the December 21, 2012 Order in the Hobet Litigation.

**5.  Necessity of Extension.**  During the six-month period of Patriot's bankruptcy, Patriot was without the resources required to begin construction of the BCRs necessary to meet the final compliance deadlines for Category II outlets.  Additionally, ERP's start-up capital has been less than anticipated.  Given the time lost during Patriot's Chapter 11 process and its limited resources, ERP has been unable to construct BCRs in time to meet the MCD obligations it assumed or remedy existing states of noncompliance at mining operations subject to the MCD and Hobet Litigation.

## II. DEFINITIONS

**6.  Definitions.**  The following terms shall have the meanings set forth below in this Selenium Settlement Agreement.

> **Bankruptcy Court** shall mean the United States Bankruptcy Court for Eastern District of Virginia or other bankruptcy court of competent jurisdiction.

**Clean Water Act or CWA** shall mean the Federal Water Pollution Control Act, 33 U.S.C. §§1251 *et seq.* as in effect at the Effective Date.

**Corridor G Mining Complex** shall mean the existing and planned surface and underground mining and associated preparation plant and related facilities located in Boone and Lincoln Counties of West Virginia and proximately located to U.S. Route 119 in those counties.

**ERP** shall mean ERP Environmental Fund, Inc.

**Global Settlement Agreement** shall mean the November 15, 2012 Global Settlement Agreement between Patriot and Plaintiffs that ultimately resulted in the January 9, 2013 Modified Consent Decree.

**Highlands Conservancy** shall mean West Virginia Highlands Conservancy, Inc. (a West Virginia non-profit corporation).

**Hobet 21 Litigation** shall mean *OVEC, et al. v. Hobet Mining, LLC*., Civil Action No. 3:15-cv-04101 (S.D. W.Va.).

**Hobet Litigation** shall mean *Ohio Valley Envt'l Coalition, Inc. et al. v. Hobet Mining, LLC,* Civ. No. 3:09-cv-1167 (S.D. W.Va.).

**OVEC** shall mean the Ohio Valley Environmental Coalition, Inc. (an Ohio corporation).

**Plaintiffs** shall mean OVEC, Highlands Conservancy, and Sierra Club.

**Parties** shall mean OVEC, Highlands Conservancy, Sierra Club, VCLF, and ERP.

**Patriot** shall mean Patriot Coal Corporation and its subsidiaries, including, but not limited to, Apogee, Catenary, and Hobet.

**Patriot Litigation** shall mean *Ohio Valley Envt'l Coalition, Inc. et al. v. Patriot Coal Corp.,* Civ. No. 3:11-cv-00115 (S.D. W.Va.).

**Settlement Agreement** shall mean the current Selenium Settlement Agreement.

**Surface Mining** shall mean the removal of the earth and rock covering from the surface of the land to extract the coal beneath.

**Surface Mining Necessary for and Incidental to Reclamation** shall mean coal extraction performed in conjunction with, and to offset the cost of, the removal of overburden where the disturbance would not otherwise occur but for the need to generate material for the reclamation of highwalls, compliance with approximate original contour standards, or to meet other SMCRA reclamation obligations.  Should a dispute arise

regarding whether mining is incidental to reclamation, the parties agree to defer to WVDEP guidance on the matter.

**SMCRA** shall mean the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§1201 *et seq.* as in effect at the Effective Date.

**VCLF** shall mean VCLF Land Trust, Inc.

### III.  HOBET 22 AND PATRIOT LITIGATION OBLIGATIONS

**7.  Revisions to Court Order - Hobet 22 Litigation.**  The Court's December 21, 2012 Order in the Hobet Litigation established a compliance deadline of August 1, 2014 for outlets associated with the Hobet 22 Litigation.  Although Hobet completed construction of the agreed-upon treatment facilities at its Corridor G Mining Complex, the BCR has experienced certain operational issues that may necessitate the addition of a sand filter and certain other adjustments. No later than five business days after the execution of this Settlement Agreement, the Parties shall file a joint motion with the District Court to modify the above-referenced compliance date in the Hobet Litigation to August 1, 2018.

**8.  Revisions to Court Order - Patriot Litigation.**  The January 9, 2013 MCD established, among other things, the following compliance deadlines for outlets involved in the Patriot Litigation:

> a. Category 1 – March 15, 2015;
> b. Category 2 – March 15, 2016;
> c. Category 3 – December 15, 2016;
> d. Category 4 – May 15, 2017;
> e. Category 5 – March 15, 2018.

No later than five business days after the execution of this Settlement Agreement, the Parties shall file a joint motion with the District Court to amend the January 9, 2013 MCD to extend the compliance dates in the Patriot Litigation as follows:

> a. Category 1 – September 15, 2018;
> b. Category 2 – September 15, 2019;
> c. Category 3 – June 15, 2020;
> d. Category 4 – November 15, 2020;
> e. Category 5 – September 15, 2021.

Plaintiffs will not oppose those deadlines after lodging of the Decree.  If, however, the Court, EPA, WVDEP, and/or any other responsible entity requires those deadlines to be shortened, this settlement shall remain in full force and effect so long as the deadline extension is between 36 and 42 months.

**9.  Appendix E Outlets.**  Patriot subsidiaries received enforceable effluent limits or compliance schedules for the outlets listed in Appendix E.  ERP is obligated to fulfill Patriot's former

treatment obligations with respect to Appendix E outlets.  Plaintiffs agree not to oppose ERP's efforts to seek an extension of the compliance deadlines for Appendix E, so long as they are identical to the compliance deadline extensions for the relevant Category or Categories described above.  Plaintiffs' agreement not to oppose ERP's efforts to extend compliance deadlines for Appendix E is limited to not filing adverse public comments, appealing permit modifications so long as they are identical to compliance deadline extensions described above, filing citizen suits opposing those extensions, or petitioning EPA or other federal agencies to object to the extension of agreed to compliance deadlines applicable to Appendix E outlets.

**10.  Court Entry of Modified Consent Decrees.** The obligations of this Settlement Agreement are contingent upon the District Court providing the relief sought in Paragraphs 7 and 8. If the District Court fails to grant the relief sought pursuant to Paragraphs 7 and 8, this Settlement Agreement shall terminate, and the obligations set forth herein shall have no further force or effect.  Provided, however, that if ERP and/or VCLF file a petition under either chapter 11 or chapter 7 of title 11 of the United States Code prior to the entry of orders by the District Court effectuating the relief sought in Paragraphs 7 and 8 of this Settlement Agreement, then any and all funds placed in Escrow pursuant to the Escrow Agreement prior to the date that ERP and/or VCLF file for bankruptcy shall become the sole property of and shall be released to Appalachian Headwaters, Inc., pursuant to the terms of the Escrow Agreement.

**11.  Effect of this Agreement on Hobet Litigation and Patriot Litigation.** Except as expressly set forth in Paragraphs 7 and 8, nothing in this Settlement Agreement shall modify the judgment and injunctive relief granted in the Hobet Litigation and Patriot Litigation.

## IV. CONDUCTIVITY LITIGATION

**12.      Effect of this Agreement on Hobet 21 Litigation.**  Plaintiffs filed *OVEC, et al. v. Hobet Mining, LLC*., Civil Action No. 3:15-cv-04101 (S.D. W.Va.) ("Hobet 21 Litigation") on April 6, 2015.  The suit alleges violations of the CWA and SMCRA related to discharges of pollutants associated with conductivity emanating from approximately 20 permitted valley fills and 10 reclaimed fills at the Hobet 21 mine.  Plaintiffs agree to dismiss the Hobet 21 suit without prejudice within 15 days of entry of the sought amendment to the MCD by the Court.  Plaintiffs agree not to refile the Hobet 21 Litigation for at least forty-two (42) months from the date of entry of the sought amendment to the Modified Consent Decree.  This agreement is contingent upon VCLF adhering to the conditions of this settlement agreement.

## V. CONSIDERATION

**13. Monetary Donation to West Virginia Nonprofit.** VCLF agrees to donate $6,000,000 to Appalachian Headwaters, Inc.  VCLF shall complete the $6,000,000 donation in installment payments, as follows:  Retroactive to May 1, 2016, VCLF shall place $125,000 per month on the first day of each month into Escrow pursuant to the terms of the Escrow Agreement.  Upon entry by the Court of an order granting the relief described in Paragraphs 7 and 8, the funds in Escrow shall be released to Appalachian Headwaters, pursuant to the Escrow Agreement.  On the first day of each month thereafter, through and including April 1, 2017, VCLF shall make a monthly donation to Appalachian Headwaters, Inc., in the amount of $125,000 per month.  On May 1,

2017, and on the first of each month thereafter, through and including October 1, 2019, VCLF shall make a monthly donation to Appalachian Headwaters, Inc., in the amount of $150,000 per month.  Appalachian Headwaters's interest in the $6,000,000 donation, and VCLF's obligation to make the $6,000,000 donation's constituent installment payments, shall be secured by a perfected security interest in 100% of the shares of VCLF Loudoun Holdings, LLC.  On or about August 17, 2016, Virginia Conservation Legacy Fund, Inc., a Virginia corporation, conveyed its right, title, and interest to 313 acres of land in Loudoun County, Virginia (the "Loudoun Property") to VCLF Loudoun Holdings, LLC (the "Virginia LLC").  VCLF is the present owner of VCLF Loudoun Holdings, LLC.  Pursuant to the terms of the Escrow Agreement, VCLF shall deliver the certificate representing its membership interest in VCLF Loudoun Holdings, LLC to the Escrow Agent.   In the event that VCLF fails to make any of the monthly payments described above within thirty (30) days of due date for that payment, such failure shall constitute an incurable default.  In the event of such a default, pursuant to the terms of the Escrow Agreement, the Escrow Agent shall endorse the certificate of membership interest in VCLF Loudoun Holdings, LLC, to Appalachian Headwaters, Inc., and deliver that certificate to Appalachian Headwaters, Inc. In the event of default, defined as VCLF failing to make a scheduled payment within 30 days of its due date, the extensions referenced in Paragraphs 7 and 8 shall remain in effect.  In such an event Appalachian Headwaters, Inc., may exercise all the rights of a secured creditor under the applicable Uniform Commercial Code.  In addition, in connection with the Loudoun Property, at the option of Appalachian Headwaters, Inc., Appalachian Headwaters, Inc. may proceed in good faith, in a commercially reasonable manner, to cause the Virginia LLC to market the Loudoun Property and to extract the highest purchase price practicable from the sale of the property, and then, after such sale, may cause the Virginia LLC to pay to Appalachian Headwaters, Inc., the balance of the $6,000,000 referenced in this paragraph, net of all reasonable fees.  Before any such sale Appalachian Headwaters shall give notice to VCLF as if under Section 9-611 of the Virginia Uniform Commercial Code (Va. Code 8.9A-611).  VCLF's monthly payments shall be recalculated according to the new balance after sale of the Loudoun Property.  In the event that the net proceeds of the Loudoun County property are greater than the outstanding balance of the $6,000,000 total donation amount, the excess shall be returned to VCLF by direct payment or by assignment of the Membership Interest in the Virginia LLC back to VCLF.  Furthermore, in the event that default, as defined in this Paragraph, occurs prior to the entry of Orders by the District Court effectuating the relief sought in Paragraphs 7 and 8, then such a default shall be treated as if it had occurred on the day after the District Court enters such Orders, and the Plaintiffs have the right to instruct the Escrow Agent to deliver the Virginia LLC Certificate to the Plaintiffs, in accordance with the Escrow Agreement.

**14. No Additional Surface Mining.**  In exchange for Plaintiffs' agreement not to pursue conductivity actions against former Patriot permits (¶ 12), VCLF agrees that ERP shall not conduct Surface Mining at any Patriot permits except Surface Mining Necessary for and Incidental to Reclamation.

**15. Reclamation Pilot Projects.**

(a)     VCLF and ERP, together with Appalachian Headwaters, shall use their reasonable best efforts to identify locations upon permits held by ERP to test new or

innovative reclamation and/or stream mitigation techniques developed by Appalachian Headwaters (collectively, the "Pilot Projects").

(i)      VCLF and ERP shall meet with Appalachian Headwaters within 30 days of the submission by Appalachian Headwaters of a list of potential Pilot Projects to discuss which Pilot Projects can be completed and to select appropriate locations for such Pilot Projects.

(ii)     VCLF and ERP understand that the ability to place a conservation easement upon the completion of a Pilot Project is an essential element of selecting a location for a Pilot Project.  Plaintiffs understand that VCLF and ERP may not have authority to commit to placing such conservation easements on leased properties and are unable to expend funds to purchase those rights.  Appalachian Headwaters and VCLF and ERP will work together in selecting locations where VCLF and ERP already have the authority to place conservation easements and, if necessary, to work with third-party property owners to secure such rights; provided that, nothing herein shall require VCLF and ERP to expend money in placing these conservation easements other than typical filing fees, recording fees, administrative fees, and taxes.  Unless waived by Appalachian Headwaters in its sole discretion, conservation easements shall be placed on land after the Pilot Projects are complete.

(b)      VCLF and ERP, together with Appalachian Headwaters, will target a minimum of 250 acres of cumulative reclamation through the Pilot Projects and will work together to develop a budget for in-kind contributions and plan for each Pilot Project.  The Parties anticipate that priority will be given to sites where there are only reclamation activities left to complete.

(c)      VCLF and ERP agree to discuss with Appalachian Headwaters, Inc. in-kind contributions, including costs associated with operator, equipment time, maintenance and fuel, to complete Pilot Projects on mining sites controlled by VCLF or ERP, to the extent that such sites are selected for Pilot Projects.  VCLF and ERP will provide in-kind contributions of at least $300,000 per year in 2017, 2018, and 2019.  VCLF agrees to grant Appalachian Headwaters a perfected security interest, in the form of a first-priority lien on a Bucyrus-Erie Model 2570 drag line, which is currently located at its Catenary Mine Complex within one business day of the execution of this Selenium Settlement Agreement, to secure its obligation to provide $900,000 total of in-kind contributions.

## 16.    Long-Term Reclamation Collaboration

(a)      VCLF and ERP and their affiliates and Appalachian Headwaters will negotiate an agreement-in-principle (the "Agreement-in-Principle") to explore further opportunities to cooperate on reclamation of additional properties held by the VCLF and/or ERP.

(b)     The Agreement-in-Principle shall set forth the terms and conditions by which VCLF and ERP and Appalachian Headwaters shall attempt to expand the innovative techniques that are proved by the Pilot Projects to be successful to additional sites and cost-sharing issues related to additional costs associated with these techniques.

(c)     Assuming that appropriate sites can be identified, VCLF and ERP agree that they will provide, at their cost, machinery, maintenance, and labor for future Appalachian Headwaters projects that take place on property owned or controlled by VCLF and/or ERP.  The obligation set forth in this paragraph is in addition to, and not in place of, the $900,000 total of in-kind contributions described in Paragraph 15(c), above.

(d)     Appalachian Headwaters and VCLF and ERP will use commercially reasonable efforts to negotiate and enter into a definitive agreement regarding the scope of future collaboration on reclamation projects within 9 months of the Court's entry of the relief sought in Paragraphs 7 and 8.

## VII. DISPUTE RESOLUTION

**17. Notice of Dispute**. If either the Plaintiffs (collectively) or ERP believe a dispute has arisen under this Agreement, then the Plaintiffs or ERP as the case may be, shall provide written notice of the issue they believe to be in dispute, the nature of the dispute, and the terms of this Settlement Agreement impacted by the dispute to the other Parties to this Agreement.
Upon receipt of any such written notice, the Parties agree to move expeditiously and in good faith to seek to negotiate an acceptable resolution of the dispute for a period of twenty-one (21) days. If a dispute has not been satisfactorily resolved during the twenty-one (21) day period of good faith negotiations, at the conclusion of any such negotiation, any Party may ask the United States District Court for the Southern District of West Virginia, to whose jurisdiction the Parties hereby expressly and irrevocably consent, to enforce the Settlement Agreement. The sole relief available for any alleged violation of paragraph 9 or paragraph 12 shall be injunctive relief and not money damages.

## VIII. NOTICE

**18. Notice.**  Any notice or other documents required or permitted to be given under the terms of this Settlement Agreement shall be deemed delivered (i) when received, if personally delivered; (ii) upon receipt of an electronic copy, facsimile, or other electronic transmission; or (iii) one business day after delivery thereof to a nationally recognized overnight delivery service which provides receipt of service addressed to the Parties as follows:

If to ERP or VCLF:

Tom Clarke, President
PO Box 87

Natural Bridge, VA  24578
(540) 204-1588
Tom.Clarke@Kissito.org

With a copy to:

Chris Hunter, Counsel for VCLF and ERP
500 Lee St. E. Suite 1600
Charleston, WV 25301
(304) 340-1203
chunter@jacksonkelly.com


If to OVEC, Highlands Conservancy, or Sierra Club:

Derek Teaney
Senior Attorney
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304.793.9007 (Tel.)
304.645.9008 (Facsimile)
dteaney@appalmad.org


Any Party may unilaterally replace the person designated to receive notice on its behalf under this Selenium Settlement Agreement by sending written notice of such replacement to the other Parties.

## V. GENERAL TERMS

**19.  Modification of this Settlement Agreement.** This Settlement Agreement may be modified only in writing and only by mutual consent of the Parties.

**20. Assignment.** The Plaintiffs may not assign their rights and obligations under this Settlement Agreement without the express written consent of the Parties, nor shall any third party succeed to the rights and obligations of the Plaintiffs under this Agreement without the express written consent of all Parties.

**21. Third Parties.**  This Settlement Agreement is not intended for the benefit of any third party, except Appalachian Headwaters, Inc., and shall not be enforceable by any third party, except Appalachian Headwaters, Inc.  Nothing in this Settlement Agreement is intended to bind any third party.

**22. Force Majeure.** "Force Majeure," for purposes of this Settlement Agreement, is defined as any event arising from causes beyond the reasonable control of ERP or VCLF, of any

4832-9276-7285.v1

entity controlled by ERP or VCLF, or of ERP or VCLF's contractors, which delays or prevents the performance of any obligation under this Settlement Agreement despite ERP and VCLF's best efforts to fulfill the obligation. The requirement that ERP and VCLF exercise "good faith efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible. "Force Majeure" does not include ERP or VCLF's financial inability to perform any obligation under this Global Settlement Agreement.

**23. Construction.** Questions regarding the interpretation of this Settlement Agreement shall not be resolved against any Party on the ground that this Agreement has been drafted by that Party.  This Settlement Agreement is the result of review, negotiation, and compromise by each Party in consultation with competent counsel of its choosing.

**24.  Authority to Enter Into Agreement.**  The undersigned representative for each Party represents, certifies, and warrants that he or she is duly authorized by the Party whom he or she represents to enter into the terms of this Settlement Agreement and bind such Party legally to the Settlement Agreement.

**25.  Execution in Counterparts.** This Settlement Agreement may be signed simultaneously or in counterparts by the respective signatories, which shall be fully valid and binding as if a single document was signed by all of the signatories, and the counterparts, together shall constitute one single document.

For VCLF Land Trust, Inc.
and ERP Environmental Fund, Inc. ("ERP"):

_____
Name: Thomas M. Clarke
Title: President and CEO (VCLF Land Trust, Inc.) and Treasurer/Managing Member ("ERP")
Date: August 19, 2016

For Ohio Valley Environmental Coalition, Inc.


_____
Name: Derek O. Teaney
Title:   Counsel for Ohio Valley Environmental Coalition, Inc.
Date:   August 19, 2016

For West Virginia Highlands Conservancy, Inc.


_____
Name: Derek O. Teaney
Title:   Counsel for West Virginia Highlands Conservancy, Inc.
Date:   August 19, 2016

4832-9276-7285.v1

For Sierra Club

_____

Name:  Derek O. Teaney
Title:   Counsel for Sierra Club
Date:   August 19, 2016