IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**WEST VIRGINIA HIGHLANDS**
**CONSERVANCY, INC., et al.,**

    **Plaintiffs,**

v.                                                                           **CIVIL ACTION NO. 3:11-CV-0115**

**ERP ENVIRONMENTAL FUND, INC., et al.,**

    **Defendants.**

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR ORDER TO SHOW
CAUSE WHY THE RECEIVERSHIP ESTATE OF ERP ENVIRONMENTAL FUND,
INC., ACTING BY AND THROUGH DOSS SPECIAL RECEIVER, LLC, SHOULD
NOT BE HELD IN CIVIL CONTEMPT AND FOR ISSUANCE OF AN EMERGENCY
<u>ORDER PRESERVING THE STATUS QUO</u>**

        The Receivership Estate of ERP Environmental Fund, Inc. ("Receivership Estate"), managed by Doss Special Receiver, LLC ("Special Receiver"), is in contempt of Court for violating the Second Modified Consent Decree (CM/ECF #105), and intends to take additional action that violates that decree today, August 25, 2022.[1] Exhibit 1. That additional action will enable imminent surface mining—with the attendant bulldozing and blasting—at a currently forested 450-acre site in violation of the Second Modified Consent Decree. Accordingly, Plaintiffs seek relief to purge the Receivership Estate's contempt, and an Emergency Order preserving the status quo.

        As explained below, ERP Environmental Fund, Inc. ("ERP") applied for (in 2018) and obtained (in 2019) a surface mining permit in violation of the Second Modified Consent Decree. That act placed ERP in contempt of Court, and that status was inherited by the Receivership Estate upon its creation in March 2020.

---

[1] Plaintiffs believed that they had an agreement from the Receivership Estate to give Plaintiffs three-days' notice prior to taking that action. On August 25, 2022, the Receivership Estate provided notice that it "will be signing a reclamation services agreement relating to the Buck Fork Surface Mine permit as soon as today (this afternoon)," but with an effective date of Tuesday, August 30, 2022. Exhibit 1.

Moreover, the Receivership Estate, acting by and through the Special Receiver,[2] has taken at least two additional actions—with a third to occur today, August 25, 2022—to allow Surface Mining[3] prohibited by the Second Modified Consent Decree under that permit. First, the Receivership Estate contemptuously sought (in November 2021) and obtained (in January 2022) permission from a state court to enter into agreements with third parties that would allow impermissible Surface Mining under the permit. Second, the Receivership Estate contemptuously applied for (in April 2022) and obtained (in July 2022) an operator assignment for that permit. And third, the Receivership Estate will sign a reclamation services agreement on August 25, 2022, that will enable imminent Surface Mining at the site. Exhibit 1. Accordingly, Plaintiffs respectfully request that this Court issue an Order to Show Cause requiring the Receivership Estate to show why it should not be held in civil contempt.[4] Plaintiffs further seek emergency relief to preserve the status quo until the merits of this motion are resolved.

## FACTUAL BACKGROUND

### The Second Modified Consent Decree

On October 7, 2016, this Court entered the Second Modified Consent Decree, CM/ECF #105, and retained jurisdiction to enforce that decree, id., ¶105. That decree expanded the prior Modified Consent Decree, under which ERP's predecessor in interest—Patriot Coal Corporation ("Patriot Coal")—agreed to severely restrict its surface mining operations in Central Appalachia. CM/ECF #87. When ERP assumed Patriot Coal's obligations through the Second Modified Consent

---

[2] Per the terms of the order that created it, the Receivership Estate is "under the management, operation and control of the Special Receiver." Exhibit 2, ¶15. Thus, whenever an action by the Receivership Estate is described in this memorandum, it should be assumed that such action was, or must be, by and through the Special Receiver.

[3] This memorandum uses the term "Surface Mining," as defined by the Second Modified Consent Decree, to mean "the removal of the earth and rock covering from the surface of the land to extract the coal[.]" CM/ECF #105, ¶27.aa.

[4] Sections C & D, *infra*, provide greater detail about the relief Plaintiffs seek.

Decree, a significant new term was added to the order: a blanket prohibition—to which ERP agreed—against any Surface Mining at any location formerly owned or operated by Patriot Coal or its subsidiaries. CM/ECF #105, ¶63. The only exception to that prohibition is for surface mining "necessary and incidental to reclamation." Id. Thus, under the Second Modified Consent Decree, only Surface Mining that is both necessary and incidental to reclamation is permitted at any location formerly owned or operated by Patriot Coal or its subsidiaries.

Moreover, although the Second Modified Consent Decree allowed ERP to acquire permits "for existing Surface Mining facilities or complexes[,]" such permits are expressly "[s]ubject to the limitations … in Paragraph 63." CM/ECF #105, ¶54. Accordingly, any permit obtained for an existing mining facility or complex at a location formerly owned or operated by Patriot Coal or its subsidiaries must be limited in such a way that no Surface Mining is authorized except that which is necessary and incidental to reclamation.

Paragraphs 54 and 63 of the Second Modified Consent Decree apply to and are binding upon the Receivership Estate. Paragraph 24 of the Second Modified Consent Decree anticipates assignment or successorship, stating: "The provisions of this Second Modified Consent Decree apply to and are binding … upon [ERP] **and any of its respective successors and/or assigns**; and upon other persons or entities otherwise bound by law." CM/ECF #105, ¶24 (emphasis added). Moreover, this Court added the Receivership Estate—under the sole and exclusive control of the Special Receiver—as a defendant in this action on June 25, 2020, thereby formally subjecting the Receivership Estate to the provisions of the Second Modified Consent Decree. CM/ECF #213. Thus, the Receivership Estate stands in the shoes of ERP and inherited the restrictions and obligations of the Second Modified Consent Decree (including ERP's violations of its terms). Moreover, the Receivership Estate may not now, pursuant to the Second Modified Consent Decree to which it is bound, conduct (or

3

contract to allow)[5] any Surface Mining at any location formerly owned or operated by Patriot Coal or its subsidiaries unless that surface mining is both necessary and incidental to reclamation.

**Permitting History of the Hewitt Creek No. 1 and Buck Fork Surface Mines**

Before Patriot Coal's bankruptcy, Hobet Mining, LLC—a Patriot Coal subsidiary—held Surface Mining Permit No. S502799 for the Hewitt Creek No. 1 Surface Mine ("Hewitt Creek"). Exhibit 3; see also CM/ECF #105, ¶¶1, 5. Hobet Mining operated Hewitt Creek until the permit was transferred in 2009 to Patriot Coal subsidiary Coyote Coal Co., LLC. See Exhibit 4. Coyote Coal in turn operated the mine until 2016 when ERP acquired the permit through the Patriot Coal bankruptcy. See Exhibit 5. Accordingly, from August 2006 to October 26, 2016, Hewitt Creek was operated by Patriot Coal subsidiaries.

Also prior to the Patriot Coal bankruptcy, Coyote Coal obtained Surface Mining Permit No. S500511 for the Buck Fork Surface Mine ("Buck Fork"). See Exhibit 6. Through Patriot Coal's bankruptcy, ERP received the Buck Fork permit from Coyote Coal on July 14, 2016. See Exhibit 7. Thus, from March 14, 2012 to July 14, 2016, Buck Fork was operated by Patriot Coal subsidiary Coyote Coal. See W. Va. Code §22-3-3(o) (defining "operator" to mean "any person who is granted … a permit to engage in any activity covered by this article and any rule promulgated under this article").

Hewitt Creek and Buck Fork are part of the "Corridor G Complex." See Exhibit 8. On July 19, 2016, ERP relinquished and surrendered Permit No. S500511 for the Buck Fork mine. See Exhibit 9. Contemporaneously with that action, ERP sought and obtained from the West Virginia Department of Environmental Protection ("WVDEP") a revision to Permit No. S502799 for Hewitt Creek, that

---

[5] See Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y, 774 F.3d 935, 950 (9th Cir. 2014) (holding "a party may be held in contempt for giving a non-party the means to violate an injunction").

reduced the elevation contours in the reclamation regrade plan for the Hewitt Creek site by eliminating from that plan any use of excess spoil from the Buck Fork mine in reclamation of the Hewitt Creek facility. See Exhibit 10; Exhibit 11.

In 2018—roughly two years after (1) this Court entered the Second Modified Consent Decree, (2) WVDEP issued Revision 8 for Hewitt Creek, and (3) ERP relinquished Permit No. S500511 for Buck Fork—ERP changed its mind about forgoing mining Buck Fork. On May 9, 2018, ERP—in violation of the Second Modified Consent Decree—submitted an application to "re-permit" Buck Fork for the exact surface mine area and location as the previous Buck Fork permit (Permit No. S500511). Exhibit 12. WVDEP re-permitted Buck Fork on March 18, 2019 through Mining Permit S500118. Exhibit 13. On August 14, 2018, WVDEP approved Incidental Boundary Revision 7 at Hewitt Creek, including ERP's updated plan to overstack excess spoil from the "re-permit[ted]" Buck Fork on the Hewitt Creek site. See Exhibit 14.

Expert engineer John Morgan has reviewed relevant documents in the permit files for the Hewitt Creek and Buck Fork surface mines. Morgan Decl., ¶¶3-11 (attached as Exhibit 15). In Morgan's expert opinion, to a reasonable degree of engineering certainty, the reissued Buck Fork permit (S500118) authorizes mining that is not necessary and incidental to reclamation of the disturbed area at the Hewitt Creek site. Id., ¶10. The 2018 regrade plan for Hewitt Creek authorizes more material to be stacked on the Hewitt Creek site than is required to backfill the disturbed area and reclaim the permit to either the previously-approved 2016 plan or to the anticipated configuration of a revised plan that would be required if no further mining occurs at the Hewitt Creek site. Id., ¶¶3-4, 6, 8-9.

**The Special Receiver's State Court Motion to Authorize Surface Mining at Buck Fork**

On November 30, 2021, the Special Receiver filed a "Motion for Entry of Order Authorizing Receiver to Enter into Reclamation Services Agreements" in the Kanawha County Circuit Court

5

(hereinafter, the "Receivership Court"). Exhibit 16. In that motion, the Special Receiver sought authorization to enter into coal subleases and operator contracts for surface mining at Hewitt Creek (Permit No. S502799) and the re-permitted Buck Fork Surface Mine (Permit No. S500118). Id., ¶¶3, 5. Although the Special Receiver included little detail regarding reclamation plans for either Hewitt Creek or Buck Fork, it is clear the Special Receiver intends to contract to mine to the limits allowed by the permit for the Buck Fork site—a largely undisturbed and forested area of land—and dispose of the excess spoil on the disturbed areas of the adjacent Hewitt Creek. Nothing in the motion committed to limiting coal extraction to that necessary and incidental to reclamation. See generally id.

Among the Special Receiver's stated objectives is the generation of revenue to cover receivership expenses. See id. at ¶6 ("Perhaps most importantly, under the terms of the reclamation services agreements, … [Contractors] will pay the Receiver the following proposed royalty rates for all coal mined pursuant to the accompanying subleases[.]"). The Special Receiver anticipates receiving royalties under the contemplated agreements, which would fund "maintenance, monitoring and reclamation at additional ERP permits and to cover various overhead costs of the Receivership Estate." Id. at ¶¶6–7. Accordingly, the Special Receiver contemplated mining activity with the express aim of funding overhead costs and reclamation activities at **other** ERP permits.

Plaintiffs opposed the Special Receiver's motion in the Receivership Court because the Special Receiver was proposing to violate the Second Modified Consent Decree. Exhibit 17. The Special Receiver replied to Plaintiffs' opposition, arguing, inter alia, that Paragraph 63 is inapplicable because the Special Receiver believed (erroneously) that Buck Fork was never owned, operated, or permitted by Patriot Coal or its subsidiaries. Exhibit 18.

On January 13, 2022, over Plaintiffs' objections, the Receivership Court entered an order authorizing entry of the Special Receiver's proposed reclamation services agreements and ordering that all resulting royalties be "used by the Receiver to accomplish maintenance, monitoring, and

reclamation at ERP surface mining permits and to cover various overhead costs of the Receivership Estate[.]" Exhibit 19 at 2. The Receivership Court's order, however, expressly "recognize[d] the existence, applicability, and enforceability of the federal court's Second Modified Consent Decree as to the Receivership Estate, the Special Receiver, and any Contractors acting under [its] order," and provided that "nothing in [the] Order should be construed to modify or otherwise affect the terms and conditions of the Second Modified Consent Decree, or its applicability or enforceability." Id. at 2–3.

After the Receivership Court issued its Order, on January 28, 2022, Plaintiffs notified the Receivership Estate and Special Receiver that, if the Special Receiver persisted in its plans to advance surface mining at Buck Fork, the Plaintiffs would ask this Court to issue such orders as were appropriate to enforce the Second Modified Consent Decree. Since that time, the parties have engaged in discussions regarding the Special Receiver's plans at Buck Fork, and Plaintiffs retained an expert mining engineer to help them understand those plans. Plaintiffs again notified the Receivership Estate and Special Receiver (on July 20, 2022) of the contemptuous nature of the plans and of Plaintiffs' intent to seek to enforce the Second Modified Consent Decree in this Court. Discussions continued thereafter, and Plaintiffs were informed today, August 25, 2022, that the Receivership Estate will execute a reclamation services agreement as soon as this afternoon that will allow mining to begin on Tuesday, August 30, 2022. Exhibit 1.

### **The Special Receiver's Operator Assignment and Future Surface Mining Plans**

In further pursuit of its plans to allow impermissible Surface Mining at Buck Fork, on or about April 25, 2022, the Receivership Estate applied to WVDEP to issue an Operator Assignment for Hewitt Creek and Buck Fork, which would name Potomac-North Inc. as the operator of those mines. See Exhibit 20. On July 20, 2022, WVDEP approved the Operator Assignment. Exhibit 22.

On August 12, 2022, in a status report to the Receivership Court, the Receivership Estate stated that:

> Negotiations are nearly complete with a reclamation contractor for reclamation on the Hewitt Creek and Buck Fork permits. … A start-up date for reclamation work and coal production is expected in mid- to late-August.

Exhibit 21 at 7. That status report establishes that mining at Buck Fork would be imminent within days of execution of a reclamation services agreement.

Today, August 25, 2022, the Receivership Estate informed Plaintiffs that it will execute as soon as this afternoon a reclamation services agreement that would empower Potomac-North to begin Surface Mining at Buck Fork. Exhibit 1. The Receivership Estate represents that the effective date of that reclamation services agreement will be Tuesday, August 30, 2022. Id.

## ARGUMENT

**A.     The Provisions of Paragraphs 54 and 63 of the Second Modified Consent Decree Apply to the Hewitt Creek No. 1 and Buck Fork Surface Mines.**

Paragraph 54 of the Second Modified Consent Decree provides:

> Subject to the limitations in this paragraph and in Paragraph 63, [ERP] and its Affiliated Companies are not precluded from obtaining any required permits, regulatory approvals or other authorizations, including Clean Water Act Section 404 permits, for existing Surface Mining facilities or complexes.

CM/ECF #105, ¶54. Paragraph 63, in turn, states:

> Notwithstanding any other provision of this Second Modified Consent Decree, from the Effective Date of this Second Modified Consent Decree, [ERP] and its Affiliated Companies shall not conduct Surface Mining at any location formerly owned or operated by Patriot Coal Corporation or one of Patriot Coal Corporation's subsidiaries, except that Surface Mining necessary and incidental to reclamation.

CM/ECF #105, ¶63. Thus, any permit obtained "for existing Surface Mining facilities or complexes" must be "[s]ubject to the limitations … in Paragraph 63," which in turn restricts Surface Mining activity at "any location formerly owned or operated by Patriot Coal [or its] subsidiaries" to only that which is "necessary and incidental to reclamation."

8

Hewitt Creek and Buck Fork were part of an "existing Surface Mining facilit[y] or complex[]"—whether the Corridor G complex or a smaller complex consisting only of Hewitt Creek and Buck Fork. Exhibit 8. Accordingly, under Paragraph 54, any permit obtained for that complex must conform to the limitations in Paragraph 63 that restrict Surface Mining to that which is "necessary and incidental to reclamation."

Moreover, both Hewitt Creek and Buck Fork are locations formerly operated by Patriot Coal subsidiaries for purposes of Paragraph 63's restrictions on Surface Mining. As discussed above, Hewitt Creek was operated by Patriot Coal subsidiaries from August 2006 to October 26, 2016. Exhibits 3-5. Likewise, the entire location of Buck Fork was previously operated by a Patriot Coal subsidiary by virtue of it holding Surface Mining Permit No. S500511. W. Va. Code §22-3-3(o). As described above, a Patriot Coal subsidiary obtained Surface Mining Permit No. S500511 for Buck Fork and was its operator until the permit's transfer to ERP on July 14, 2016. Exhibits 6-7.

In short, Paragraphs 54 and 63 of the Second Modified Consent Decree apply to both Hewitt Creek and Buck Fork because both were part of an "existing Surface Mining facilit[y] or complex[]" at a "location formerly owned or operated" by a Patriot Coal subsidiary.

**B.     The Receivership Estate is in Contempt of the Second Modified Consent Decree.**

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." Shillitani v. United States, 384 U.S. 364, 370 (1966). This inherent power may be exercised, and sanctions for civil contempt may be imposed, "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the contumacy." Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 821 (4th Cir. 2004) (quoting In re General Motors Corp., 61 F.3d 256, 258 (4th Cir. 1995)).

In the Fourth Circuit, a party moving for civil contempt of a lawful order or decree must show by clear and convincing evidence:

> (1) The existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's "favor"; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive) of such violation; and (4) that the movant suffered harm as a result.

JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc., 359 F.3d 699, 705 (4th Cir. 2004) (cleaned up).[6]

Here, the Receivership Estate is presently in contempt of the Second Modified Consent Decree in two ways. **First,** the Receivership Estate stepped into ERP's shoes upon its creation by Receivership Court order and took on all "all existing claims, liens, and encumbrances against [ERP] or its properties or assets." Exhibit 2.[7] One such claim is Plaintiffs' claim for relief for ERP's contemptuous acquisition of a permit for Buck Fork under Paragraph 54 of the Second Modified Consent Decree that does not conform to Paragraph 63 of that decree.

**Second**, the Receivership Estate engaged in additional contemptuous actions in pursuit of its plans to allow impermissible Surface Mining at Buck Fork by (1) seeking and obtaining permission from the Receivership Court to authorize one or more third parties to mine under the Buck Fork permit; (2) assigning its rights to operate the Buck Fork permit; and (3) negotiating and executing, as

---

[6] Without question, this Court has the jurisdiction and authority to enforce the Second Modified Consent Decree and order the Receivership Estate to purge its contempt. The Receivership Estate has asked the Court to refer this matter to Special Master James Kyles. CM/ECF #243. Plaintiffs will file a full response to that motion, but this dispute is outside Special Master Kyles's bailiwick. The legal questions presented are solely the prerogative of this Court, and any factual disputes do not involve wastewater treatment—Special Master Kyles's expertise.

[7] The Receivership Court's preliminary injunction that continued the receivership beyond the expiration of the temporary restraining order that created it similarly makes clear that the Receivership Estate took on claims against ERP. Exhibit 23, ¶19. That order also makes clear that the Special Receiver is not empowered "to carry on any business or activity which [ERP] is not lawfully entitled to carry on," id., ¶22, and that nothing in the Receivership Court's order "affect[s] the right of the Plaintiffs in [this action] to enforce … [the] Second Modified Consent Decree," id., ¶41.

soon as today, August 25, 2022, a reclamation services agreement that empowers Potomac-North to begin Surface Mining at Buck Fork as soon as August 30, 2022.

> **1. ERP, the Receivership Estate, and the Special Receiver Had Actual and/or Constructive Knowledge of Paragraphs 54 and 63 of the Second Modified Consent Decree.**

All relevant parties had actual or constructive knowledge of the limitations set out in Paragraphs 54 and 63 of the Second Modified Consent Decree at all relevant times. First, ERP had actual knowledge of the terms in Paragraphs 54 and 63 of the Second Modified Consent Decree prior to submitting its application to "re-permit" Buck Fork. ERP executed the Second Modified Consent Decree and is a defendant in Civil Action No. 3:11-cv-115.

Moreover, the Receivership Estate and the Special Receiver acquired actual knowledge of the Second Modified Consent Decree and its terms no later than the May 2020 proceedings in this action that resulted in the Receivership Estate being joined as a Defendant in this action. CM/ECF #213.

> **2. The Second Modified Consent Decree Was in the Plaintiffs' "Favor."**

Unquestionably, a consent decree in a Clean Water Act action like the Second Modified Consent Decree is entered in the plaintiffs' "favor" when it places future environmentally protective obligations and restrictions on the defendant. See Ohio Valley Envtl. Coalition v. Apogee Coal Co., LLC, 744 F.Supp.2d 561, 568-69 (S.D. W. Va. 2010).

> **3. By Their Conduct, ERP and the Receivership Estate Have Violated the Terms of the Second Modified Consent Decree.**

ERP violated the terms of the Second Modified Consent Decree by seeking and obtaining a permit for the Buck Fork Surface Mine that does not conform to the Second Modified Consent Decree. The Receivership Estate violated the Second Modified Consent Decree by taking steps in

furtherance of its plans to allow surface mining at Buck Fork beyond that which is necessary and incidental to reclamation.

### a. ERP Obtained The Buck Fork Permit In Violation of the Second Modified Consent Decree.

Paragraph 54 of the Second Modified Consent Decree expressly subjects any permit obtained for "existing Surface Mining facilities or complexes" to the limitations within Paragraph 63. As established above, Buck Fork and Hewitt Creek constitute an "existing Surface Mining facilit[y] or complex[]" as that term is used in Paragraph 54. Exhibit 8. Thus, when ERP submitted its application to "re-permit" Buck Fork in 2018, it was doing so under the auspices in Paragraph 54 and could only act subject to the limitations of Paragraph 63.

Paragraph 63 expressly prohibits Surface Mining at any location previously owned or operated by Patriot Coal or its subsidiaries, except when such mining is "necessary and incidental to reclamation." CM/ECF #105, ¶63. A Patriot Coal subsidiary was the operator at Buck Fork from 2012 to 2016. Exhibits 6-7; W. Va. Code §22-3-3(o). Thus, there can be no question that Buck Fork is a location formerly operated by a Patriot Coal subsidiary.

Although ERP relinquished the prior permit in 2016, Exhibit 9, it applied to WVDEP in 2018 "re-permit" the exact same mine at the exact same location. Exhibit 12. It did not, however, limit its application to conform to the restrictions of Paragraph 63. Nonetheless, WVDEP issued the permit as sought by ERP in March 2019. Exhibit 13. Consequently, ERP impermissibly sought and obtained a permit that violates the terms of Paragraph 54 and 63 of the Second Modified Consent Decree.

Surface Mining Permit No. S500118 for the Buck Fork site authorizes mining activity that goes beyond that which is necessary and incidental to reclamation. The Second Modified Consent Decree incorporates by reference the Selenium Settlement Agreement signed by Plaintiffs and ERP, CM/ECF #105, ¶18, which defines "Surface Mining Necessary for and Incidental to Reclamation" to mean:

12

> coal extraction performed in conjunction with, and to offset the cost of, the removal of overburden **where the disturbance would not otherwise occur but for the need to generate material for the reclamation of highwalls, compliance with approximate original contour standards, or to meet other SMCRA reclamation obligations.**

CM/ECF #105, App. F, ¶6 (emphasis added). The key phrase in that definition is its limitation on removal of overburden to "where the disturbance would not otherwise occur **but for the need** to generate material" for reclamation. Id. (emphasis added). Accordingly, a showing of need to generate material is required in order to demonstrate the mining activity is "necessary and incidental to reclamation," and any permit obtained by ERP pursuant to Paragraph 54 of the Second Modified Consent Decree for a location formerly owned or operated by a Patriot Coal subsidiary was required to be limited to coal extraction in conjunction with overburden removal that "would not otherwise occur but for the need to generate material" for reclamation.

Moreover, it is clear from that definition what is **not** "necessary and incidental to reclamation." The phrase does not allow surface mining that is merely **convenient** for reclamation. Nor does it permit coal removal that is merely in **conjunction** with reclamation. Rather, "necessary and incidental to reclamation" is a very restrictive term. As used in the Second Modified Consent Decree, it allows the Receivership Estate (or its successors-in-interest) to conduct Surface Mining only "where the disturbance would not otherwise occur but for the need to generate material for the reclamation" of disturbed areas. CM/ECF #105, App. F, ¶6.

Here, Buck Fork (Permit No. S500118) was not so limited. Rather, as established by the Morgan Declaration, that permit authorizes Surface Mining that that is not necessary and incidental to reclaiming the disturbed area at the Hewitt Creek site, Morgan Decl., ¶10, to a prior WVDEP-approved regrade configuration. Morgan Decl, ¶¶3-11 (attached as Exhibit 15). The 2018 regrade plan for Hewitt Creek authorizes more material to be stacked on the Hewitt Creek site than is required to backfill the disturbed area and reclaim the permit to the previously-approved 2016 plan. Id., ¶¶3-4, 9-10. As a result, ERP violated Paragraphs 54 and 63 of the Second Modified Consent Decree when it

13

applied for and obtained Permit No. S500118 for the Buck Fork site. By retaining the permit without purging its contempt, ERP remained in a state of violation of the Second Modified Consent Decree, and the Receivership Estate continues to remain in that state to this day.

> **b. The Receivership Estate Engaged in Contemptuous Acts In Furtherance of Plans to Conduct Surface Mining Beyond That Which is Permissible Under the Second Modified Consent Decree.**

At some unknown time, the Receivership Estate devised plans to authorize third parties to conduct Surface Mining at Buck Fork in excess of that which is permissible under the Second Modified Consent Decree. In furtherance of those plans, the Receivership Estate sought (in November 2021) and obtained (in January 2022) authorization from the Receivership Court to execute agreements that would enable third parties to conduct Surface Mining at the Buck Fork site to the full extent authorized by that permit. Exhibit 16, 19. On December 17, 2020, Plaintiffs filed an opposition to the Special Receiver's motion, warning that it threatened to allow actions prohibited by this Court's order. Exhibit 17. Nonetheless, the Receivership Estate did not withdraw its motion. The Receivership Court ultimately granted the motion, though it clarified that its order had no effect on the Receivership Estate's obligations to comply with the Second Modified Consent Decree. Exhibit 19.

On April 25, 2022, the Receivership Estate took another action in furtherance of its plans to cause and allow a third party to engage in impermissible Surface Mining at the Buck Fork site by applying to WVDEP for an Operator Assignment that would assign its rights to engage in surface mining operations at the Hewitt Creek and Buck Fork sites, including those rights the Receivership Estate only had by virtue of holding the Permit No. S500118 for Buck Fork. Exhibit 20. WVDEP issued the sought Operator Assignment on July 20, 2022. Exhibit 22.

By obtaining the above-described state-court order and Operator Assignment, and executing today's reclamation services agreement, the Receivership Estate violates the Second Modified Consent Decree in two ways. **First**, it acted under the authority of the Permit No. S500118—a permit which it

was never supposed to seek or hold. **Second**, it contemptuously gave "a non-party the means to violate an injunction" knowing "it is highly likely the non-party will use those means to violate the injunction." Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y, 774 F.3d 935, 950 (9th Cir. 2014). Court orders "would have little practical force, and would be rendered essentially meaningless, if [courts] were unable to prevent parties bound by them from flagrantly and materially assisting others to do what they themselves are forbidden to do." Id. at 952.

### 4. The Plaintiffs Have Suffered Harm as a Result of the Receivership Estate's Conduct.

The harm that Plaintiffs have suffered as a result of the Receivership Estate's violations of the Second Modified Consent Decree is the loss of the benefit of the bargain:

> [W]hen a motion for civil contempt is based on the violation of a consent decree, the contractual nature of the consent decree itself gives rise to the necessary harm because it is presumed that the terms of the consent decree embody a contractual right procured by the movant in exchange for a right which it relinquished. . . . This accords with basic contract principles which enforce a promisor's promise to forego its legal right in exchange for the promisee's promise to forego its legal right.

Nutramax Laboratories, Inc. v. Manna Pro Products, LC, Civil Action No. 0:16-cv-01255-JMC, 2016 WL 11604340 (D.S.C. Dec. 1, 2016); see also Buffalo Wings Factory Inc. v. Mohd, 574 F.Supp.2d 574 581 (E.D. Va. 2008). Plaintiffs have lost their benefit of the bargain as a result of the above-described violations. Therefore, the Plaintiffs' have suffered a cognizable harm.

Moreover, the imminent Surface Mining that is likely to occur without an Emergency Order threatens to irreparably harm 450 forested acres at the Buck Fork site because of the vast disturbance caused by Surface Mining and its attendant blasting and movement of millions of cubic yards of rock and dirt.

### C. This Court Should Order the Receivership Estate to Purge Itself of Its Ongoing Contempt.

In cases of civil contempt, "[t]he appropriate remedy . . . is within the court's broad discretion." In re General Motors Corp., 61 F.3d at 259. The purpose of civil contempt is to coerce compliance. See International Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 827 (1994). Here, the Plaintiffs seek a coercive order (1) declaring the Receivership Estate to be in contempt of this Court's Second Modified Consent Decree; (2) instructing the Receivership Estate on how it may purge its contempt; (3) compelling the Receivership Estate to cease all conduct that would further its plans to allow Surface Mining under the Buck Fork permit; (4) awarding reasonable attorney's fees; and (5) any other relief that this Court deems appropriate. Plaintiffs respectfully ask that this Court's contempt order direct the Receivership Estate to purge its contempt by either relinquishing Permit No. S500118 or modifying Permit No. S500118 in such a way that it conforms to the limits on Surface Mining in Paragraph 63 of the Second Modified Consent Decree as determined by this Court.[8]

### D. This Court Should Preserve the Status Quo and Issue an Emergency Order Prohibiting Further Actions In Violation of the Second Modified Consent Decree.

The Court has an inherent equitable power to protect its own judgments, "[t]he hallmark of [which], of course, is its flexibility." Thompson v. U.S. Department of Housing & Urban Development, 404 F.3d 821, 830 (4th Cir. 2005). Indeed, as the Fourth Circuit recognizes, "[t]he district court must be free to exercise its equitable powers as necessary to remedy the problem." Id.

---

[8] To ensure finality in this dispute, and to prevent a situation where the Buck Fork permit "ping-pongs" back and forth from WVDEP to this Court to determine whether it conforms to the Second Modified Consent Decree, as part of this contempt proceeding the Court should hold a hearing after allowing sufficient time for discovery and thereafter make a finding as to the amount of Surface Mining at Buck Fork, if any, that is truly necessary for and incidental to the reclamation of Hewitt Creek.

### 2. The Court Should Issue An Emergency Order Preserving the Status Quo.

Here, an Emergency Order preserving the status quo is necessary to remedy the Receivership Estate's violations. In an August 12, 2022 status report to the Receivership Court, the Receivership Estate stated its expectation that mining would "start-up" at Buck Fork in mid- to late-August after the execution of a reclamation services agreement. Exhibit 21 at 7. Today, August 25, 2022, the Receivership Estate provided Plaintiffs notice that it will execute such an agreement as soon as this afternoon, with an effective date of August 30, 2022. Exhibit 1. For those reasons, Surface Mining under the Buck Fork Surface Mine is imminent.

Pursuant to its inherent equitable power to enforce the Second Modified Consent Decree, this Court should issue an emergency order prohibiting the Receivership Estate, by and through the Special Receiver, from taking any further action under the authority of Permit No. S500118. Prohibited acts should include, but not be limited to, conducting Surface Mining (or authorizing any third-party to conduct surface mining) at the Buck Fork site, taking steps to transfer any permit related to the Buck Fork site to any third party, and conveying any interest in surface or mineral estates at the location of the Buck Fork Surface Mine. The Emergency Order should further compel the Receivership Estate to take any and all actions necessary to ensure that no Surface Mining is conducted at the Buck Fork site until this motion is resolved. Such an order is necessary to preserve the status quo and protect the environmental resources at Buck Fork. Moreover, the order should remain in effect unless and until the Receivership Estate purges its contempt.

Such an Emergency Order is well within the Court's authority in this contempt proceeding because "[a] district court has great discretion in deciding how to enforce violations of its own orders." Eagle Comtronics, Inc. v. Arrow Commc'n Lab'ys, Inc., 305 F.3d 1203, 1314 (Fed. Cir. 2002).

Because Plaintiffs seek to prevent violations of an already existing injunction that will deprive Plaintiffs of the benefit of their bargain and result in devastating land disturbance and deforestation,

17

the typical multi-factor injunction test does not apply.[9] Even if that were not so, the Emergency Order that Plaintiffs seek would still be appropriate under the applicable preliminary injunction inquiry. That inquiry requires the movant to establish "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest." Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019) (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)).

Here, Plaintiffs are likely to succeed on the merits because the Receivership Estate has violated the terms of the Second Modified Consent Decree, as established above. The environmental harm to the forests and streams at the Buck Fork site threatened by the Receivership Estate's ongoing violations of the Second Modified Consent Decree is unquestionably irreparable. See Sierra Club v. U.S. Army Corps of Eng'rs, 981 F.3d 251, 264 (4th Cir. 2020). And the threatened loss to Plaintiffs of the benefit of their bargain in the Second Modified Consent Decree is irreparable because money damages will not remedy it. See, e.g., Marfork Coal Co. v. Smith, Civ. No. 5:10-cv-0069, 2010 WL 742560, *5 (S.D. W. Va. Feb. 26, 2010). Those harms outweigh any potential harm to the Receivership Estate from the Emergency Order, which would be solely monetary. Ohio Valley Envtl. Coalition v.

---

[9] District courts have wide discretion in crafting remedies to protect the integrity of their lawful orders. For example, in Delaware Valley Citizens' Council for Clean Air v. Commonwealth of Pennsylvania, the district court enjoined the Secretary of Transportation (who was not even alleged to be in violation of a court order) from funding highway projects in Pennsylvania in order to coerce the contemnor—the Commonwealth of Pennsylvania—to bring itself into compliance with a Consent Decree resolving a Clean Air Act citizen suit. 533 F.Supp. 869, 883 (E.D. Pa. 1982). The district court did not engage in the typical multi-factor injunction analysis before implementing that remarkable remedy. The Third Circuit affirmed, holding that the district court did not "abuse[] its wide discretion in fashioning a remedy," Delaware Valley Citizens' Council for Clean Air v. Com. of Pa., 678 F.2d 470, 478-79 (3d Cir. 1982), and the Supreme Court denied certiorari, 59 U.S. 969 (1982). More recently, a federal district court in Maryland observed that it had the authority to issue an injunction to remedy a violation of its orders and proceeded to issue a mandatory injunction without engaging in the typical multi-factor injunction analysis. Schwartz v. Rent-A-Wreck of Am., 261 F.Supp.3d 607, 617-18 (D. Md. 2017).

18

U.S. Army Corps of Engr's, 528 F.Supp.2d 625, 632 (S.D. W. Va. 2007). Finally, the sought Emergency Order is in the public interest because a court has "no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience." Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 450 (1911).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to issue an Order to Show Cause and an Emergency Order preserving the status quo until this contempt matter is resolved.

DATED: August 25, 2022

Respectfully submitted,

*/s/ Elizabeth Bower*

ELIZABETH A. BOWER (WVBN 13589)
DEREK O. TEANEY (WVBN 10223)
J. MICHAEL BECHER (10558)
APPALACHIAN MOUNTAIN ADVOCATES, INC.
P.O. Box 507
Lewisburg, WV 24901
Telephone: (434) 996-0802
Email: ebower@appalmad.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
# HUNTINGTON DIVISION

**WEST VIRGINIA HIGHLANDS**
**CONSERVANCY, INC., et al.,**

    Plaintiffs,

v.                                                      CIVIL ACTION NO. 3:11-CV-0115

**ERP ENVIRONMENTAL FUND, INC., et al.,**

    Defendants.

## CERTIFICATE OF SERVICE

    I, Elizabeth Bower, do hereby certify that on August 25, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system, which will notify the following participants:

**Robert G. McLusky**
**Christopher M. Hunter**
JACKSON KELLY PLLC
P.O. Box 553
Charleston, WV 25322
rmclusky@jacksonkelly.com
chunter@jacksonkelly.com

**Kevin Michael Rose**
BOTKINROSE PLC
3210 Peoples Drive
Harrisonburg, VA 22801
krose@botkinrose.com

                                                                             Elizabeth A. Bower (WVBN 13589)